WILLIAM T. WINGATE, Respondent, v. E. A. BUNTON, Appellant.

Kansas City Court of Appeals, May 1, 1916.

1. **DAMAGES: Malicious Assault: Elements of Damage.** Humiliation, bodily pain and mental anguish each and all resulting as they do from an unprovoked assault and consequent personal injury, are elements of general damages and properly referable to the jury under general allegations of assault and wounding.

2. ————: **Compensatory: Aggravation.** Where there are no circumstances of aggravation, the damages should be compensatory only and that one should not be punished so ex-

tremely for an injury inflicted under strong provocation as he would be from the same injury wantonly inflicted without any circumstances of excuse or palliation.

3. ———: **Malice.** The term "malice" in its legal meaning imports nothing more than that the wrongful act was wilful and intentionally wrongful and the quality of wilfulness may be presumed from the facts that the act was wrongful and without just cause or excuse.

4. ———: **Assault and Battery.** In order for an assault and battery to be held to have been malicious so as to allow the assessment of damages, it must be shown that it was intentional and without just cause or excuse.

5. **EVIDENCE: Admissions: Punitive Damages.** It is not error in an action for malicious assault to elicit from defendant the admission that he knew plaintiff was worth sixty or seventy thousand dollars, since the fact of plaintiff's unquestionable solvency and defendant's knowledge thereof, were circumstances of aggravation of material bearing on the issue of punitive damages.

Appeal from Clay Circuit Court.—*Hon. Frank P. Divelbiss,* Judge.

AFFIRMED.

*C. F. Strop, Graham & Silverman* and *Craven & Moore* for respondent.

*Hewitt & Hewitt, Ralph Hughes* and *M. P. Lawson* for appellant.

JOHNSON, J.—This is an action for actual and punitive damages for a malicious assault plaintiff alleges was committed upon him by defendant, May, 27, 1913. The answer is a general denial and a plea of *son assault desmesne.* Verdict was returned for plaintiff for $500 actual and $1,000 punitive damages and after his motions for new trial and in arrest of judgment were overruled, defendant appealed.

The parties lived at Mayesville, were interested together in a number of business enterprises as part-

ners or stockholders and were men of substantial means, plaintiff's wealth being estimated at more than fifty thousand dollars. They were partners in the ownership of two race horses valued at $1,000, and plaintiff had been attending personally to the business of racing the horses which had proved a losing venture. He claims defendant had refused to bear his share of the losses and on the day preceding the assault he had purchased defendant's interest which was one-third, agreeing to pay therefor $333.-33. We infer this transaction marked the end of close and amicable business relations which had existed between them. Plaintiff contends that the purchase price of defendant's interest in the horses was to be taken into account in a settlement and adjustment of all their business affairs to be made on his return from a trip to Smithville where he intended to take the horses for training. Defendant appears to have understood that the money was to be paid before the removal of the horses from Maysville. Plaintiff had possession of the horses and the next day took them to the railroad stock pens and was proceeding to load them in a car for shipment to Smithville when defendant appeared and a dispute ensued which culminated in a fistic encounter.

Plaintiff and an assistant were leading the horses through the yards to the gate at the entrance to the loading chute when defendant placed himself in front of plaintiff and asked if plaintiff had arranged at the bank for payment of the purchase price. Receiving a negative answer defendant said: "You had better, hadn't you?" Plaintiff answered: "I don't know why, you are owing me anyhow." Defendant said: "You will have to settle with me or you aint going to ship these horses," and seized the halter rope by which plaintiff was leading one of them. The two men jerked at the rope and finally the horse pulled

loose from both of them.  Defendant recaptured the horse and had a servant lead it to his barn.  Then pushing back his sleeves defendant approached plaintiff and said: "You will settle with me right here."  Plaintiff replied: "I don't think I will" and thereupon defendant began striking at plaintiff with his fist.  Two or three blows reached plaintiff's arm and shoulder causing some pain but no physical injury of any consequence.  Plaintiff used his hands to ward off the blows and during the encounter struck defendant lightly on the face.  Defendant picked up a stone and threatened to kill plaintiff, but did not throw it.  Friends intervened at this point and the parties separated.

One of these friends, a Mr. Duncan, then undertook the office of intermediary with the result that plaintiff gave his check to Duncan for $333.33 to hold as trustee for defendant until plaintiff returned from Smithville and had a business settlement with defendant.  At first plaintiff told Duncan he would give his check to defendant but the latter refused to accept it and then plaintiff agreed to give the check to Duncan on the understanding that it would not be presented at the bank until plaintiff's return.  He told Duncan he did not have sufficient funds on deposit to pay the check.  Defendant then had the horse brought back to the stock yards and delivered to plaintiff who shipped both horses to Smithville.  The next day Duncan presented the check to the bank but payment was refused because of insufficient funds.  The evidence relating to subsequent events is not material to the present inquiry and need not be stated.

The facts we have stated are drawn from the evidence most favorable to plaintiff.  Defendant testified: "I went to the yards and asked Mr. Wingate what he was going to do with the mares and he said he was going to ship them, and I told him the

understanding was he was to pay me first and he said he would pay me when he got ready. He started to lead the mare past and I grabbed hold of the rein. . . . He jerked me towards him and we both struck at one another. The mare jerked loose and ran to the back of the yard or lot. He went and caught her and came back with her right straight up to the gate. I grabbed hold of the rein again. We jerked the mare back and forth—that is, the rein in one another's hands—and I stooped down and picked up a rock and told him to let go. He let go. I turned the mare over to my man and told him to take her back to the place: told Mr. Wingate when he paid me the $333 according to agreement, that he could take the mares and do what he pleased with them."

"Q. That's all that transpired up to that time? A. Yes, sir.

"Q. Between you and him. What, if anything, was said about a check and who said it? When did you first learn about his giving a check? A. At that time before he left the yard, I demanded a settlement in full of all other business and his retirement from the bank. Then I left. Mr. Brant and I started to the car. We had gone to the car when Mr. Duncan came over out of the yard to the car, and said that Mr. Wingate would fix the matter. I asked him how. He said that he would put up his check. I said I wouldn't accept his check.

"Q. Say how much he would put up his check for? A. $333-1-3.

"Q. What further occurred? A. Well, he said that—I told Mr. Duncan that if he would get the money and pay me for the mares Saturday or Monday that they could go. Well, he said he would do it. I ordered my man to bring the mare back and I went back to the yard, went back and told Mr. Duncan, that whenever he got the money and would be re-

sponsible and turn it over to me, whether Wingate got back or not, and give me the money, Wingate could take the mares and do what he pleased—is what I think I said."

On cross-examination defendant testified that during the encounter he picked up a stone and, to the question, "Did you intend to throw that?" answered "I don't know. I would have gone as far as possible to protect myself and property."

The argument of counsel for defendant on the demurrer to the evidence which they insist should have been given proceeds largely from the version of the encounter appearing in defendant's evidence. In the discussion of the questions raised · by the demurrer, we must reject defendant's evidence relating to disputed facts and accept as true the evidence of plaintiff. That evidence shows that defendant, without justification or reasonable excuse attacked and struck plaintiff and threatened to kill him, and that plaintiff, at all times, acted on the defensive and merely tried to ward off the blows aimed at him. Defendant does not say that he acted in defense of his person but seeks to justify the assault on the ground that he employed no greater force than was required to regain his property which plaintiff was in the act of removing from the county. The rule stated in State v. Dooley, 121 Mo. 1. c. 599 and State v. Forsythe, 89 Mo. 667, which defendant invokes,· does not aid his position. The gist of those decisions is that in the recapture of personal property from a thief or robber the owner may resort to great force with propriety but "where there is clearly no felony, but a mere dispute as to the legal ownership, a resort to violence, disproportionate to the value of the property and where peaceful remedies would prove equally efficacions should not be sustained." The great weight of authority throughout the country, as well as the

plainest demands of social order, support the view that the private right of recaption is subordinate to the preservation of the public peace, since the public peace- is a superior consideration to any man's private property, consequently the right depends upon the existence of two indispensable elements, viz., "first possession by the owner and, second, a purely wrongful taking or conversion without a claim of right." [Cooley on Torts (3d Ed.), 63 and 64.] The author just quoted further says: If one has entrusted his property to another who, honestly, though erroneously claims it as his own, the owner has no right to take it by personal force." [See also Bliss v. Johnson, 73 N. Y. l. c. 533; Stuyvesant v. Wilcox, 92 Mich. 228, 52 N. W. 465; Wright v. Page, 2 Tyler (Vt.) 80; 3 Cyc. 1085.]

Defendant was not the owner of the horses nor of any interest in them at the time of the assault, nor had he been in possession of them. During the time he and plaintiff owned them as partners plaintiff, with his consent, had taken charge of them and was in such possession when plaintiff purchased defendant's interest and became their sole owner. But on the theory of the parties that plaintiff, at the time of the assault, was a joint owner of the property with defendant and, as such, was in sole possession, defendant had no possessory right as against him, since the rule is well settled that one joint owner of personal property cannot maintain replevin against another in possession. [Pulliam v. Burlingame, 81 Mo. 111; Gossett v. Drydale, 48 Mo. App. 430; Ingals v. Ferguson, 59 Mo. App. 299; 30 Cyc. 445, 462 & 468.]

If it should be considered that defendant had sold his interest and retained a lien on the property to secure the payment of the purchase price his position would not be improved since a mere lien holder would have no right to take the law in his own hands

by using physical violence to gain possession of the subject of the lien. From whatsoever angle we view the facts of the case the assault clearly was without legal justification or excuse and must be regarded as the culmination of an attempt to coerce plaintiff into paying the purchase price of defendant's interest in the horses without regard to the adjustment of their other business affairs. Defendant knew he was in no danger of losing any just demand he might establish in the courts against plaintiff and his effort to excuse his conduct on the plea of defense of property is without substantial foundation. The court did not err in refusing the demurrer to the evidence.

Many objections are urged against the rulings on the instructions. We do not share the view of defendant that there is no evidence of physical injury. The unprovoked and unjustifiable striking of plaintiff in anger thereby inflicting pain certainly was a battery sufficient to support a recovery for compensatory damages and the elements of such damages are bodily pain and mental anguish and humiliation. The law infers bodily pain and suffering from personal injury (2 Sutherland on Damages (3 Ed.), 421; West v. Forrest, 22 Mo. 344) and also infers injury to the feelings and mental anguish. [Brown v. Railroad, 99 Mo. 130; West v. Forrest, supra.] As is well said by NORTONI, J. in Stewart v. Watson, 133 Mo. App. 1. c. 49: "Humiliation, bodily pain and mental anguish, each and all resulting as they do from an unprovoked assault and consequent personal injury, are elements of general damages, and properly referable to the jury under the general allegation of assault and wounding contained in the petition."

The argument of defendant that the court erred in submitting the issue of punitive damages to the jury is based on the conclusion drawn entirely from his own evidence that he acted in good faith and under

sufficient provocation.   The general rule of damages is invoked that where there are no circumstances of aggravation, the damages should be compensatory only (Franz v. Hilterbrand, 45 Mo. 1. c. 123) and that one should not be punished so extremely for an injury inflicted under strong provocation as he would be for the same injury wantonly inflicted without any circumstances of excuse or palliation.   [Yeager v. Berry, 82 Mo. App. 534.]

Punitive damages are recoverable by a plaintiff only where the act from which he suffered injury partakes of the nature of a public as well as of a private injury.   It is to the interest of the public that acts which are inimical to peace and good order should be punished in a manner to discourage others from repeating them and "in such cases there is no certain fixed standard; for the jury may not only take into view what is due to the party complaining, but to the public, by inflicting what are called in law speculative, exemplary, or vindictive damages."   [Franz v. Hilterbrand, supra.]

The evidence of plaintiff portrays the assault as malicious, i. e. as the intentional doing of a wrongful act without just cause or excuse and strips it of every semblance of having been provoked by plaintiff whose conduct is shown to have been restricted within the confines of clear legal right.   He was in possession of property of which he was, at least, a joint owner; was proceeding to ship it to Smithville in the usual course of the business he and defendant had been engaged in as partners, and in so doing was violating no part of the agreement he had just made for the purchase of defendant's interest.   The jury were entitled to accept these as the true facts of the case and to regard the conduct of defendant as not having been prompted by any fear of an unjust loss or desire to protect his property, but as a wanton and wilful de-

termination to have his own way with plaintiff at all hazards.

The term "malice" in its legal meaning imports nothing more than that the wrongful act was wilful or intentionally wrongful and the quality of wilfulness may be presumed from the facts that the act was wrongful and was without just cause or excuse. See McMillan v. Elder, 160 Mo. App. l. c. 406, and authorities cited, where it is aptly said: "In order for an assault and battery to be held to have been malicious so as to allow the assessment of punitive damages, it is sufficient that it was intentional and without just cause or excuse."

We have answered the principal objections to the rulings on the instructions and dispose of the others with the statement that they are obviously not well taken and do not call for special discussion. Objections to rulings on evidence likewise are ill founded. It was not error to elicit from defendant the admission that he knew plaintiff "was worth sixty or seventy thousand dollars," since the facts of plaintiff's unquestionable solvency and defendant's knowledge thereof were circumstances of aggravation of material bearing on the issue of punitive damages.

Nor was it error to admit the testimony of the witness Duncan who acted as mediary between the parties after the assault, that he accepted the check for $333.33 with the information from plaintiff that the latter did not then have sufficient funds in the bank to pay it. The witness had broken his promise to hold the check and defendant sought to avail himself at the trial of the fact that the bank had refused to pay the check on presentation. As we have said the fact that defendant knew he had no reason to anticipate any pecuniary loss from the shipment of the property had an important bearing on the issue of punitive damages, and it was proper for plaintiff

to offer evidence explanatory of a circumstance which, if allowed to go unexplained, would tend to support the contention that defendant was actuated by a fear of loss and an honest purpose to defend a property right.

There is no prejudicial error in the record and we perceive no good reason for declaring that the assessment in the verdict of either actual or punitive damages was excessive.

The judgment is affirmed.

All concur.