W. J. PINKLEY, (PLAINTIFF), APPELLANT, v. SOPHIE M. ROMBAUER, AND BERTHA E. ROMBAUER, (DEFENDANTS), RESPONDENTS.—87 S. W. (2d) 1045.

St. Louis Court of Appeals. Opinion filed December 3, 1935.

1234

*Terry, Terry & Terry* for (plaintiff) appellant.

*Thompson, Mitchell, Thompson & Young, W. K. Koerner* and *Peter H. Huck* for respondents.

HOSTETTER, P. J.—This suit was instituted on the 10th day of September, 1931, in the Circuit Court of Ste. Genevieve County. The petition is in two counts. It is a suit for damages based on a charge of conspiracy between the two defendants to injure and destroy the plaintiff's business.

In the first count it is alleged that plaintiff leased certain real estate and buildings and other property thereon from the defendants. and Irma R. Tufts, (their sister), at a rental of $25 per month. The first lease, beginning on January 15, 1927, and expiring January 15, 1930, was for store purposes only, covering store property situated in Ste. Genevieve County, Missouri, at Brickey's Station, the building having been used for years theretofore as a country store. The lease included the counters, shelving and platform scales and with the right to use the rooms above the store for living quarters for the family. It was provided therein that the lessee should keep on hands, and offer for sale during the term of the lease, a stock of groceries and such other goods as had usually been kept in the store theretofore; that the lessee should attend faithfully to the steamboat landing, commonly known as Brickey's, or Cliff Landing, and to the weighing scales, and to have, subject to concessions made to Cliffdale Lime Company, the right to use the ground floor of the warehouse or Mill building for the storage of freight in transit to or from boats handling freight at the landing and of groceries and other supplies for sale by lessee in the leased store; that the lessee should retain one-half of the gross landing charges and account to lessors for the

other half with his rental payments; that no intoxicating liquors of any kind should be sold or kept on the premises.

The description of the leased property is as follows:

"The following property situated in fractional section 13, township 39 north, range 7 east, in Ste Genevieve County, Missouri, at Brickey's Station, the building for years used as a country store, with the counter, shelving and platform scales, . . ."

It was further averred in said first count, that plaintiff went into possession of the leased property and purchased large stocks of goods, wares and merchandise suitable for his place of business and had built up a large and lucrative business as a country merchant; that defendants, desiring to injure plaintiff's income, unlawfully, willfully and maliciously conspired, confederated and associated themselves together with the common desire to injure plaintiff's business, trade or income, at or about the ——— days of June, July, August, September and October, 1927, and at other times during the term of the lease not wholly known to the plaintiff; that in furtherance of such conspiracy said defendants did order, direct, threaten and attempt to drive away and insult, and did drive away and insult and cause to stay away from plaintiff's business and to quit dealing with plaintiff, certain customers (here naming fourteen individuals) and various and sundry other persons, whose names are unknown to plaintiff, by using offensive and indecent language and threatening to sue for crossing the leased premises and premises which were a necessary adjunct to the leased premises; that in furtherance of said conspiracy defendants willfully, maliciously and unlawfully ordered said customers off the premises in the vicinity of the store; that by said acts plaintiff's business, trade, occupation and income were greatly injured and plaintiff was injured in his business and income and deprived of the patronage of his customers by reason of such willful, malicious and unlawful furtherance of said conspiracy and by the acts of defendants plaintiff lost great numbers of his customers who were prevented from coming to his place of business and thereby deprived of profits and incomes to plaintiff's actual damages in the sum of $10,000 and punitive damages in the sum of $10,000, for all of which he prayed judgment.

The second count was similar in all respects to the first count except that it covered the period of a second lease which began on the 15th day of January, 1930, and was for a three year period. The description of the leased premises in the second count was as follows:

"The following property situated in fractional section 13, township 39 north, range 7 east, in Ste. Genevieve County, Missouri, at Brickey's Station, the building for years used as a country store, including the yard between the store building and the mill building, ten feet of ground adjacent to and in front of the store building,

and three feet of ground adjacent to and on the side of the store building toward the railroad right of way, . . ."

The second lease also contained the following provision:

"It is understood that the lessors own the land between the low-water mark of the Mississippi River and the wall of the store building towards the river and nothing in this lease contained shall be construed to affect in any way the rights of the lessors to exclude all persons from said strip of land between the river and said building, nor to affect in any way the sole control by the lessors of the debarking from, landing at or crossing to the shore of the Mississippi River."

Plaintiff continued in possession of the premises under this second lease and remained in possession until shortly before the date of the filing of this suit, to-wit: September 10, 1931.

In the second count, in addition to making similar charges to those contained in the first count, it was charged that on or about the second day of January, 1931, the defendants, in pursuance of their said conspiracy, employed Peter H. Huck, Prosecuting Attorney of Ste. Genevieve County, to threaten, humiliate and coerce one Lansing Lewis, a customer of plaintiff, into signing certain humiliating requests for permission to cross defendants' premises and conspicuously posted around said premises printed signs with the following language thereon: "Private Property. For permission to land or cross Apply to Misses Rombauer."

The cause was tried before a jury and a verdict rendered in favor of plaintiff on the first count in the sum of $2,000 actual damages and $150 punitive damages, and, on the second count in the sum of $500 actual damages, and $50 punitive damages. Defendants filed their motion for a new trial in due time, which was sustained by the court on the following grounds: That instructions given on behalf of plaintiff, Numbers A and B (the main instructions covering counts one and two) were erroneous and that the verdict was greatly excessive. Thereupon plaintiff duly perfected his appeal and brings the cause to this court for review.

The evidence showed that defendants, together with their sister, Mrs. Irma R. Tufts, own a large tract of land bordering on the Mississippi River in and about the settlement called Brickey's, about fifty miles south of St. Louis; that there are a number of buildings on this tract of land, among them a store building which has been at times rented for a boarding house, and a number of dwelling houses; that plaintiff entered into possession of the store building under the first lease and conducted a general store therein for the entire three year term of the lease; that when the first lease was about to expire, plaintiff, in November, 1929, solicited and obtained a second lease for another three year term, which began January 15, 1930,

and continued in possession of the premises until shortly before the date of the filing of this suit, to-wit: September 10, 1931.

Plaintiff testified in substance as follows:

That he was the railroad agent at Brickey's and went into possession of the leased premises and opened his store after the execution of the first lease; that the store is located about 125 feet from the Mississippi River and the land slopes from the store down to the river and that the bank of the river is rocky; that the store building is located about 25 feet east of the railroad and switch track and a filling station south of it, the boarding house directly east across the track from the depot and the boat landing just opposite the store due east; that the defendants lived in Ste. Genevieve at the time the first lease was made, but they moved to the bluff house at Brickey's in August, 1927; that from the beginning of his tenancy he made written notes of everything which either of the defendants said or did which he thought hurt his business. Consulting his notes, he testified to the following alleged acts of defendants: In September, 1927, Miss Bertha Rombauer met John Ward in front of the store and "got onto him about having his car parked where it was—too close to the house—and that he would have to move it;" that in the same month, Dave McClanahan came in there off the river with some fish and she told him she didn't want him to come in there with his boat with those old fish; that in October, 1927, she told some person, whom he did not know, that she did not allow boats to land "in here;" that on July 3, 1929, a party of St. Louis aldermen came down to inspect the hog farm on Establishment Island and that she made efforts to prevent them from crossing between the Frisco Station and the wharf, informing them that she did not want them to cross or a boat to land at this wharf (Plaintiff's son, Edward J. Pinkley, who actually operated the store, in describing this incident, testified that Stanley Ray, who operated the hog farm, was with the aldermen and walked up to Miss Rombauer and offered her his hand and she shook hands with him and "told these men that she wanted them to know that the boat was stopped there through the courtesy of the Rombauer sisters"); that on another occasion, in July, 1929, she told Stanley Ray that she didn't want him to land his boat at that point; that on October 30, 1929, she followed Alex Parkhurst, foreman on Establishment Island, from the store to the water's edge and told him not to return there with his boat; that on October 31, 1929, Miss Sophie Rombauer came down the hill from her home with opera glasses in her hand and followed Alex Parkhurst down to the water's edge; that in November, 1929, she watched, through her opera glasses, motor boats come up the river and when the boats landed she came down to the river; that on November 6, 1929, he saw Miss Bertha Rombauer in front of the store

talking to George Bryan, but did not hear what was said; that on November 10, 1929, he saw the two Misses Rombauer talking to Mr. Atkins and Mr. Ray in front of the store and that Miss Bertha asked Mr. Atkins if he was with Mr. Ray and Mr. Atkins said, "Yes," and she said, "If so, don't land here any more with Mr. Ray or I'll have you prosecuted;" that on November 13, 1929, he saw both defendants follow Alex Parkhurst down to the water's edge, but couldn't hear what was said; that on the same day he heard Miss Sophie tell Jules Godier not to return again to the boat landing with his boat; that on March 6, 1930, defendant put up three sign boards, at places not far distant from the store, which bore this inscription: "Private Property. For permission to land or cross apply to Misses Rombauer;" that on March 23, 1931 (an interval of one year having elapsed without a note being made in plaintiff's book) Miss Bertha Rombauer approached H. Halter and Fred Maisel, who were standing on the river bank and inquired what they were doing there and they replied that they were looking for a job and she asked them if the automobile standing near was their car and not receiving a prompt answer, she said: "Gentlemen, you are standing on private property, and my question deserves an answer," Maisel said: "What was it? I didn't understand you," and she asked: "How long are you going to be here?" and Maisel replied: "Just long enough to go up to this outfit and see if I can get a job;" that on April 12, 1931, he saw Miss Sophie Rombauer go down to the water's edge and wave to a motor boat not to come in to the bank; that sometime in 1931 Rev. C. E. Cross (an itinerant preacher) landed his houseboat on the bank about five hundred feet south of the store and delivered a sermon in front of the store that evening, and Miss Bertha Rombauer requested him to move.

On cross-examination plaintiff testified that at all times he and the defendants were personally on good terms; that he had not a bit of ill feeling toward them and that they had none toward him that he knew of; that they treated him all right; that during the whole time in question his family and defendants were on good terms; that his wife made gifts to defendants; that on one occasion his granddaughter and his wife went to St. Louis with defendants for a few days; that during all of the time his personal relations with the defendants were friendly; that a good many of the people living at Brickey's were tenants of defendants and traded with him; that a man named Dixon, who was renting one of defendants' houses, started going around selling groceries and that he complained to defendants and they told Dixon that they would not rent him his house unless he quit selling groceries because they thought the people ought to buy from plaintiff.

From other testimony it was shown that when plaintiff complained

about Dixon selling groceries in competition with him, the defendants wrote to the St. Louis House under which Dixon was operating, asking them to desist from furnishing goods to Dixon and to stop him from selling groceries in competition with plaintiff. Upon receipt of an unsatisfactory reply from the House they took it up directly with Dixon and his wife, who persisted in their claim that they had a right to sell groceries and expected to continue. Whereupon defendants served notice on Dixon and forced him out as their tenant. From other testimony it was also shown that plaintiff and his entire family regularly attended the Christmas parties given by defendants. It was also shown by the testimony of plaintiff's son (who looked after the store) that when there was a fire there, defendants contributed $50 to him so he could reward "the boys" for fighting the fire, and that defendants bought $40.50 worth of coal from him for their use for the winter of 1930-1931, and that friendly relations between his folks and defendants were maintained.

Plaintiff, continuing on cross-examination, testified that one Christmas defendants sent a card to each of their tenants good for a load of coal or its equivalent in groceries at the store (these cards were presented and honored at the store and defendants paid the bills); that defendants bought gasoline and ice, and, occasionally butter, from the store; that he did a good business in 1927 and 1928, but that business was not so good in 1929; that prior to January 15, 1930, when his first lease expired, he asked defendants to give him another lease for three years (this second lease was executed on November 25, 1929, and covered a period of three years commencing on January 15, 1930); that his complaint in this case is limited to what happened before this second lease was executed; that he was not complaining about this last lease; that he makes no complaint of what was said or done by defendants during the period of the second lease and that whatever damage which resulted from defendants' actions under the first lease continued on under the second lease.

It was shown by the testimony of plaintiff's son that the defendants objected to persons hunting on their premises and, particularly objected to people from Establishment Island, where the hog farm was located, crossing their premises. It appeared that they would make exceptions so as to permit persons who would secure written permission from them to cross their premises. It appeared that defendants had a pet aversion to the Establishment Island and the hog farm thereon, which was located about three miles below Brickey's. The evidence showed that the hog feeding farm had been operated on Establishment Island from 1926 to 1930. The defendants themselves, together with other witnesses, testified to the obnoxious odors from the Island, particularly when damp weather prevailed and the wind was right, also from the barges which carried down the garbage from

St. Louis to the Island, as they attracted flies and insects and emitted foul odors. However, the plaintiff and his son claimed that they smelled no odors and the plaintiff himself was very skeptical about whether any foul odors were emitted either from the barges or the Island and appeared to be somewhat skeptical of the existence of the hog farm on Establishment Island on the ground that he was never down there. It appeared 'that some of the men who worked on Establishment Island had formerly boarded at Brickey's.

Plaintiff estimated his damage from his books, which, he claimed, showed daily cash receipts and did not show the profit at the end of the year, that he could tell what profit he made because he ran a bank account and a cash account. Several local residents testified that defendants asked them to trade with plaintiff; some of them said his prices were much higher than at larger places in the county and in surrounding communities.

Miss Sophie Rombauer, in her testimony, adverted to the pleasant relations which had existed between them and the Pinkley family and testified to the gifts which had been exchanged between them and to at least two trips which defendants and members of the plaintiff's family had made together; that they both patronized the store as far as they could; that she had never spoken to Mr. Lansing Lewis in respect to his crossing their property, neither had she spoken to Stanley Ray; that she had no recollection of ever speaking to Parkhurst or Atkins or Bryan, or, to any other persons mentioned by plaintiff, in regard to crossing their property; that on one occasion she had a conversation with Edward Pinkley with reference to increasing business at the store, and suggested that they advertise and that he said they were going to do so. Miss Bertha Rombauer testified also to the pleasant relations with the Pinkleys and to the eviction of Mr. Dixon from one of their houses because he insisted upon selling groceries in competition with plaintiff, and offered in evidence the correspondence between them and the St. Louis firm in respect to the selling of groceries by Dixon in competition with plaintiff. Miss Bertha Rombauer further testified that she asked Lansing Lewis if he would like to have a permit to cross their land and sometime after that told him if he would persist in crossing their property that they would sue him for trespassing, but that she had frequently seen Mr. Lewis at the store after that time; that she had never ordered anybody to leave plaintiff's premises. She admitted that she had told the itinerant preacher, Rev. Cross, to take his houseboat off their shore, which he did. Both defendants testified that they never at any time had any ill feeling towards plaintiff and had no desire to injure his business and they never at any time said or did anything with the intent or purpose of causing him any injury; that they did everything in their power to promote plaintiff's business and patronized his store as far as they could; that they were very much inter-

ested in his success. They admitted that they had warned hunters not to hunt on their land and that they sought to prevent trespassers from being on their land.

We are of the opinion that error was committed in both instructions A and B, given at plaintiff's request, in submitting to the jury the question of punitive damages and that the trial court was justified in sustaining defendants' motion for a new trial on the ground that no punitive damages should have been allowed on either count and also on the ground that the verdict of the jury in assessing actual damages on each count was grossly excessive and also was indicative of passion and prejudice on the part of the jury.

We fail to find anything in the record to justify the conclusion that defendants had any malice or ill will whatsoever towards plaintiff or any desire or intention of injuring plaintiff in his business whatsoever. On the contrary, the record shows affirmatively, that they were actually endeavoring to promote and augment his business and to protect him, even from the "bootleg" competition of their own tenant, Dixon, who insisted on selling groceries after their protest, with the result that they routed Dixon out of the premises he was occupying. It is provided in the lease that plaintiff was obligating himself to run a grocery store. It was to the interest of defendants that he should do so. All their acts catalogued hereinbefore indicated a desire on their part that his business should prosper. It is significant that plaintiff kept notes of such acts of defendants as he thought hurt his business and made no complaint to defendants until after he gave up possession under his second lease. The facts disclosed by the record in this case not only fail to show any intent or desire, joint or several, on the part of defendants to ruin or destroy plaintiff's business, but tends to show just the contrary.

The determination of the question as to whether the facts shown in evidence warrant the award of punitive damages is one of law and it is clearly within the province of the court to say whether the facts do or do not warrant the award of punitive damages. [State ex rel. Atchison, v. Ellison, 268 Mo. 225, 186 S. W. 1064; Morgan v. Durfee, 69 Mo. 469, loc. cit. 478, 33 Am. Rep. 508; Whalen v. Centenary Church of City of St. Louis, 62 Mo. 326, loc. cit. 329; Owen v. Brockschmidt, 54 Mo. 285, loc. cit. 289; Boyd v. Mo. Pac. R. Co., 236 Mo. 54, loc. cit. 93, 139 S. W. 561.]

Plaintiff bases his claim for damages to his business as a grocery merchant on the occasional acts of defendants in telling persons to desist from trespassing on their land, to quit hunting on their land, to cease passing over their land without procuring a written permit from them so to do, to quit landing their boats on their premises. These things they had a lawful right to do. It might be that, when defendants were exercising their rights in respect to trespassers, hunters, unauthorized persons using their landing, etc., certain in-

cidental effects flowing from such activities might be a lessing of plaintiff's sales as a grocery merchant. The motive which actuated them might then become important. The unintentional blow is readily excused, but the same blow given in anger and meant as an affront, though no heavier, may merit heavy damages.

In 3 Cooley on Torts (4 Ed.), p. 553, this point is forcibly illustrated by an anecdote (rarely appearing in a dry-as-dust law treatise) which runs as follows: In his early years, Mr. Macaulay, being curious to see how an election is conducted, approached the voting place and was there struck in the face by the carcass of a dead cat. He was outraged, grossly insulted and felt that no amount of money could compensate him for the unprecedented affront. The guilty party approached, apologized, and expressed regret and assured him that the unsavory missile was not intended for him, but for another person against whom it had been thought to be a proper political argument. The injury was almost redressed at once, and Mr. Macaulay, thoroughly mollified, said, "Well, please, next time intend the missile for me and hit the other man." A tort was, of course, committed, but Mr. Macaulay's jocular remark showed that good nature had been restored and the damage was nominal.

Defendants, as riparian owners on the Mississippi River, owned to the low water mark. [State ex rel. Citizens' Electric Lighting & Power Co. v. Longfellow, 169 Mo. 109, 69 S. W. 374.] Consequently when persons landed at that place they were, necessarily, intruding on defendants' land. It was a private landing place, and defendants, who had consulted eminent counsel, doubtless felt that the public might acquire, by prescription, rights in the landing place and the approaches thereto unless their ownership was duly recognized and the use made of the premises by the public be a permissive one given by them as owners thereof. It seemed that they were willing to give written permission to any one who would apply to them for it, even to those who inhabited the hated and evil smelling hog feeding island, but certain ones of those who were reminded that they could get a written permit to use the premises rejected it with "fine scorn" and construed the suggestion as a humiliating one to them and insulting.

The visit of the St. Louis aldermen and defendants' alleged chilly reception of them is much featured in the record. However, it cannot be made clear how that could seriously affect plaintiff's business. The distinguished visitors could hardly be customers for groceries, and, being on an outing, combining business with pleasure, they might have been possible customers for "a wee bit of the cup that cheers," but plaintiff was unable to meet such wants for a triple reason, viz.: the dry law of Missouri, the 18th Amendment then still in force, and thirdly, he was bound by contract in his lease not to handle intoxicants.

Plaintiff manifestly exaggerated his loss of trade growing out of

defendants' activities in "shooing" trespassers, hunters, fishermen, hog islanders, preachers, stubborn non-conformists who would not ask for a permit to use their premises. Many of them were transients; one lived at Commerce, Missouri, another at Maplewood, Missouri, another at Crystal Heights in Jefferson County, another at St. Louis, Missouri, two transients looking for a job, an itinerant preacher who traveled in a houseboat along the river. The only persons who testified that they decreased their trade with plaintiff on account of defendants' activities were Lansing Lewis and Alex Parkhurst. Both of these men were connected with the hog feeding work on Establishment Island. Mr. Lewis receiver letters from defendants' attorneys advising him to procure written permission from defendants and explaining why they didn't desire the public to use their premises without permission, which letters he ignored, and, in his testimony, said that he formerly went to Brickey's three times a week, but, since having the objectionable conversations with defendants, he went there only twice a week. Mr. Parkhurst testified that he formerly went to Brickey's every other day, but after defendants spoke to him about landing on their property he went there only twice a week. Neither of them testified that he could not have bought at the store anything he might have desired to buy just the same as he had before.

We are urged by defendants' counsel to hold, in view of plaintiff's admission that he has no complaint to make of defendants' activities during the life of the second lease; that he has made no submissible case under the second count and that we should direct the lower court to enter up a judgment in favor of defendants on said second count. And, we are also urged, in view of their contention that no verdict for plaintiff could be permitted to stand, that we should direct the lower court to enter a judgment on the whole case in favor of defendants.

We refrain from ruling on the soundness of this contention because we do not think, in view of the nature of the appeal, that it is within our province to direct the lower court to enter up any kind of a judgment. This is not an appeal from a final judgment. It is an appeal from the action of the lower court in sustaining defendants' motion for a new trial following a judgment rendered against them in favor of plaintiff. Our review in this case is, therefore, limited to the question as to whether the lower court properly ruled on the motion for a new trial. [Fishback v. Prock (Mo. Sup.), 242 S. W. 962; Pressy v. Slezak (Mo. Sup.), 278 S. W. 382.] This Court has followed these two Supreme Court cases in the recent case of Esselman v. Devereux (Mo. App.), 78 S. W. (2d) 515.

It follows from the views hereinbefore set out that the action of the trial court in granting defendants a new trial should be affirmed and the cause remanded, and, it is so ordered. *Becker* and *McCullen, JJ.,* concur.