**Roswell L. FORDYCE, Plaintiff-Appellant,**

**v.**

**Press MONTGOMERY, Defendant-Respondent,**

**and**

**Randy Montgomery, Defendant.**

**No. 8628.**

Springfield Court of Appeals.

Missouri.

Feb. 6, 1968.

748 ■

Richard K. Wilson, Thomas Strong, Farrington & Curtis, Springfield, for plaintiff-appellant.

Turner White, Clyde R. Allemann, White & Dickey, Springfield, for defendant-respondent.

HOGAN, Presiding Judge.

Plaintiff Roswell L. Fordyce was injured in the course of a fight between defendant Randy Montgomery and one David Baldwin, Jr. In this action for compensatory and punitive damages, a jury unanimously found the controverted issues for the plaintiff, and assessed his actual damages at $650.00. In separate findings, the jury also awarded plaintiff $1,500.00 as punitive damages against defendant Randy Montgomery, and $3,000.00 as punitive damages against defendant Press Montgomery. On motion, the trial court set aside the award of punitive damages against defendant Press Montgomery, and the plaintiff has appealed.

In the background, but pertinent to the matter in hand, is a dispute between two sets of fathers and sons, defendant Press Montgomery and his son Randy, and one David Baldwin and his son David, Jr. For convenience, we shall refer to these persons as Press and Randy, and David and Junior.

Sometime before this assault took place, ill will had developed between the Montgomerys and the Baldwins. During the afternoon in question, Press telephoned Junior and asked to meet him at the Pickwick Supermarket, a grocery store in Springfield, Missouri. David volunteered to take Junior to the supermarket, and the three met there on the parking lot a short time afterward. Very shortly, the three men got in a fight. Plaintiff's version of this occurrence, given by David Baldwin, was that Press had been drinking, was "mad and real beligerent (sic)," and that Press immediately began to quarrel with Junior. Junior said, "You've been wantin' to hit me for a long time," and Press asked, "David, how old are you?" Junior answered that he was 21, and Press then turned around and hit David. David then "grabbed hold" of Press, and Junior (who was 21 years old, six feet tall and weighed 165 pounds) then "jumped onto" Press. It is not clear how long this fight went on; Press did not testify and none of the defendants' witnesses were present when it occurred. Mr. Legan, who arrived on the parking lot shortly afterward, said that David and Junior and Press were at the side of Press' car, that it was obvious they had been fighting, and that Press' eye was bleeding and he "just looked awful." Mr. Whiteley, who accompanied Mr. Legan, said that when he and Legan got to the parking lot Press was "standin' there with blood and stuff all over him * * and the Baldwins was standin' aside when we pulled up * * *." It is fairly inferable, at least from defendants' evidence, that Press got considerably the worst of this initial encounter. Press' physician, a Dr. Callaway, testified that he later examined Press, and because the bruises and wounds he received bled and swelled considerably he ordered Press to the hospital for the night.

At any rate, the initial fight broke off when Legan and Whiteley, who were Press' employees, arrived. The Baldwins then retreated inside the store and asked the manager to call the police. Defendant Randy arrived and found Press standing by his car "with blood comin' down the side of his face." The plaintiff, ignorant of this

initial melee, was inside purchasing groceries. He noticed two men, whom he later identified as the Baldwins, enter the store and step to the manager's "cage." The two men stood there and talked, and they appeared to be upset by something. After the Baldwins entered, according to the plaintiff, four other men came in the store "at a rush." Plaintiff identified these men as defendants Press and Randy Montgomery, Legan and Whiteley. As they entered, Press said, "There they are, let's get 'em." As Randy entered, he moved past a grocery cart and picked up a large coke bottle. The Baldwins moved toward the back of the store, and Junior picked up "a can of something." Randy and Whiteley chased Junior, who pushed or ran behind the plaintiff as he was being pursued. While plaintiff was trying to watch both groups of men, he saw Randy coming directly at him with the coke bottle raised over his head, apparently trying to strike Junior. The plaintiff could "see it [the coke bottle] coming down in my eyes and nose so I threw my arm up over my face," and consequently, plaintiff received the force of Randy's blow, which fell on his left elbow. There is no doubt that plaintiff sustained a painful injury.

Randy and Whiteley continued to chase Junior and finally "got hold of" him, "knocked him from one counter to the next," and finally got him down on the floor. Legan and Press then joined in the fight, and "Mr. Legan helped hold the Baldwin boy down and Press * * * kicked him in the head several times." A few minutes later the police arrived and the participants in this second fight were removed to the parking lot. There, plaintiff testified, he "smelled alcohol" on Press' breath. Plaintiff had never seen either Press or Randy Montgomery nor David or Junior Baldwin before.

The plaintiff also had the evidence of David Baldwin, which by and large corroborates his own. According to David, when he and Junior entered the store there were "probably 15 or 20 other people" inside, and when Press, Randy, Legan and Whiteley came in he repeatedly said, "Please don't tear up the store." According to David, Junior had something in his hand, Randy had several coke bottles in his hands, and "in the scramble after they [Junior and Randy] got in behind the checkout counter, Randy did swing this Coca-Cola bottle at [Junior] just as hard as he could swing it * * * and [Junior] ducked and this was when Mr. Fordyce got hit with the bottle." David testified that "all four of 'em was on [Junior] * * * and Mr. Montgomery [Press] kicked [Junior], I don't know how many times, with his foot. I saw that." David denied any participation in the fight inside the store; he simply stood and watched, he said, and attempted to persuade the participants to stop by talking to them.

The defendants' version of the case came from Legan, Whiteley and Randy. Legan said that shortly after he arrived Randy drove up and asked what was going on, and was told that the Baldwins were in the store. Randy then started in the store, followed by Legan and Whiteley, and Press came in last. Legan attempted to persuade Randy not go in, but he did anyway, and the other men followed. Legan's purpose, he said, was "to break it up if there was going to be any trouble." As he entered, Legan saw Junior picking up cans, and Randy had "some object" in his hand. Randy and Junior started fighting, Legan attempted to break it up "in the normal way you would any fight, and pretty soon I was on the bottom." Legan knew the plaintiff had been struck but could not say by whom. Whiteley's testimony was that when he got inside the store Junior was already hitting Randy in the head with "you know, cans, and everything," and he and Legan were merely trying to separate the combatants. Whiteley saw no bottle in Randy's hand. Press, Whiteley said, was simply trying to disarm Junior.

Randy testified that both Press and the other two men, Legan and Whiteley, told him to stay out of the store. He entered

anyway and picked up a coke bottle as he passed an open cooler. Junior had a can of something in his hand. After he grabbed the bottle he came up the aisle that Junior was standing in, and that was when Press and the other two men came in. Junior took half a dozen steps toward him, and "that's when we got together." Plaintiff, Randy said, must have been "ten feet or so" from Junior, and "the only way he [plaintiff] could've gotten hit at all by either one of us would have been to walk up there where the fight was takin' place." Randy had no idea what he did with the bottle. Randy testified positively that his father told him, "I wouldn't go in there," but that he was "enraged" and went in the building with the specific intention of starting a fight.

■ We have recited the facts at length because the case comes to us on appeal from the trial court's action in sustaining defendant Press Montgomery's motion for judgment notwithstanding the verdict. We have some doubt that Press' motion for directed verdict made at the close of all the evidence was specific enough to serve the office of a demurrer to the evidence or a request for a peremptory instruction directed solely to the question of his liability for punitive damages, but we prefer to rule the case on the merits and we do not undertake to discuss its procedural aspects. We do note that since the case comes to us on appeal from an order sustaining defendant Press Montgomery's after-trial motion for judgment, the question for appellate review is whether reasonable minds could differ upon the question of defendant Press Montgomery's liability for punitive damages, Cathey v. De Weese, Mo., 289 S.W.2d 51, 52 [1]; Lowes v. Union Electric Co., Mo. App., 405 S.W.2d 506, 512 [10], and in determining that question we are required to give plaintiff the benefit of all favorable evidence and the reasonable inferences to be drawn therefrom, without undertaking to judge the credibility and weight of the testimony. Steele v. Woods, Mo., 327 S.W.2d 187, 191 [1,2]; Bridges v. Arkansas-Mis-

souri Power Co., Mo.App., 410 S.W.2d 106, 107–108 [1].

The case was submitted to the jury on the general theory that the defendants, acting in concert, had injured the plaintiff in the course of a wilful and malicious attack on Junior Baldwin. The appellant argues here that since the plaintiff proved defendant Randy acted maliciously in striking him, and that the two defendants were acting in concert, it necessarily follows that Randy's malice was imputed to Press, and Press must be held to respond in punitive damages. The respondent answers this argument simply by saying there is no evidence that the two codefendants acted in concert, and therefore Randy's malice cannot be imputed to Press.

■ While we mean no criticism of their presentations, we cannot fully agree with the contentions of either party. Contrary to the respondent's assertion, we believe there is substantial evidence that he and his son were acting in concert. The plaintiff had evidence that the two defendants entered the store together, that Press then said, "There they are, let's get 'em," and that Press blocked one of the possible means of exit while Randy and Whiteley pursued Junior and threw him to the floor. There is further evidence that Press kicked Junior several times after Junior was down. In our opinion, this evidence was ample to show that the defendants were acting in concert, and it would follow that the defendants were jointly and severally liable to the plaintiff. Gray v. McDonald, 104 Mo. 303, 312, 16 S.W. 398, 400; Brown v. Barr, 184 Mo.App. 451, 455–456, 171 S.W. 4, 6. We agree with the appellant that a jury could have found that Randy acted with the malice essential to justify an assessment of punitive damages. In order to show malice in the sense involved here, it was not necessary to prove that the assailant was motivated by spite or ill will; it was sufficient to show that the defendants committed a wrongful act intentionally and without just cause or

excuse.[1] Of course, if the defendants intended an assault and battery upon Junior but succeeded by mistake in injuring the plaintiff, then they were liable to the plaintiff to the same extent as if he had been their intended victim,[2] and there is authority for the proposition that the animus of the principal assailant is attributable to all who participate in the assault.[3]

It would be highly artificial and unrealistic, however, to resolve the merits of this appeal simply by saying that the malice of one codefendant must be imputed to the other. Our Supreme Court has recognized that the joint and several liability of joint tort-feasors does not necessarily extend to liability for punitive damages in a case of this kind; there may be differing degrees of culpability among the codefendants and a jury may properly assess punitive damages against them in differing amounts. State ex rel. Hall v. Cook, Mo., 400 S.W.2d 39, 40–42 [2], [3–5]. It is well established that the sufficiency of the evidence to warrant an assessment of punitive damages is a matter of law for the court, Pinkley v. Rombauer, 231 Mo.App. 1233, 1243, 87 S.W.2d 1045, 1049–1050 [3]; 4 Sedgwick, Damages, § 1318, pp. 2659–2660 (9th ed. 1912), and if the evidence indicated that one joint assailant acted with malice, but also demonstrated beyond a difference of reasonable minds that the other did not, then it would be error to permit an assessment of punitive damages against the nonculpable defend-

ant. If a trial court erroneously permitted the assessment of punitive damages against such a nonculpable defendant, we think it might appropriately set aside the erroneous award on the ground that there was no substantial evidence to support it. See State ex rel. Atchison, T. & S. F. Ry. Co. v. Ellison, 268 Mo. 225, 233–235, 186 S.W. 1075, 1076–1077. So, assuming that the trial court's action was procedurally warranted, the question before us is whether, as a matter of law, defendant Press Montgomery acted in such circumstances of extenuation or excuse as to bar an award of punitive damages.

The evidence strongly indicates that defendant Press Montgomery was provoked; in fact, it is subject to the construction that he received a severe beating at the hands of Junior Baldwin immediately before the assault and battery inside the store took place. Provocation does not justify or excuse an assault and battery, nor relieve the defendant of liability for actual damages,[4] but evidence of provocative acts or conduct goes in mitigation of punitive damages, and if the provocation furnished by the plaintiff is sufficient to negative the existence of malice on the defendant's part, exemplary damages cannot be recovered.[5] The idea behind this principle is " * * * that one should not be punished so extremely for an injury inflicted under strong provocation as he would be for the same injury wantonly inflicted without any

1. Beggs v. Universal C. I. T. Credit Corp., Mo., 409 S.W.2d 719, 722–723 [2–4]; Hodges v. Schuermann Building & Realty Co., Mo.App., 174 S.W.2d 909, 914[5]; Daggs v. St. Louis-San Francisco Ry. Co., Mo.App., 51 S.W.2d 164, 169; Wingate v. Bunton, 193 Mo.App. 470, 479, 186 S.W. 32, 35–36[9].

2. Carnes v. Thompson, Mo., 48 S.W.2d 903, 904 [2, 3]; Smith v. Moran, 43 Ill. App.2d 373, 193 N.E.2d 466, 469[6]; Davis v. Collins, 69 S.C. 460, 48 S.E. 469, 472–473[6]; Anno., 16 A.L.R. 771, 813, § IVb (1922).

3. Rodgers v. Bryan, 82 Ariz. 143, 309 P. 2d 773, 778[11]; Reizenstein v. Clark, 104 Iowa 287, 73 N.W. 588, 590; Stark

v. Epler, 59 Or. 262, 117 P. 276, 278; Anno., supra, 16 A.L.R. at 815, § IVe.

4. Hogsett v. Smith, Mo.App., 229 S.W.2d 20, 22[5]; Hodges v. Schuermann Building & Realty Co., supra, 174 S.W.2d at 913[1]; Lawrence v. Womack, Mo.App., 23 S.W.2d 190, 192[2]; 6 Am.Jur.2d Assault and Battery, § 151, pp. 128–129.

5. Bond v. Williams, 279 Mo. 215, 221–222, 227, 214 S.W. 202, 204, 206 [2] [9], 16 A.L.R. 755; Powell v. Meiers, 54 N.D. 336, 209 N.W. 547, 550 [4]; Anno., supra, 16 A.L.R. at 816, § Va; 6 Am.Jur.2d Assault and Battery, § 188, p. 155; 6 C.J.S. Assault and Battery, § 55(4), pp. 904–905.

circumstances of excuse or palliation." Yeager v. Berry, 82 Mo.App. 534, 537. If, however, the defendant responds to provocation with disproportionate measures of reprisal, then the mitigating factor disappears and punitive damages may be assessed.[6]

We have carefully reviewed the evidence in this case, and have concluded that the respondent's after-trial motion for judgment should not have been sustained. There is evidence that defendant Press Montgomery was provoked. Baldwin's testimony that Press was the original aggressor is very weak, and he testified that during the preliminary encounter in the parking lot he, Baldwin, "grabbed hold" of Press and Junior then "jumped onto" Press. Junior was doing all the fighting, because "Press wasn't in no condition to fight." There is other testimony that Press bled profusely from the wounds he received in the parking lot, and that his injuries were severe enough to require hospitalization overnight.

■ On the other hand, the evidence also indicates that Press' reprisal was disproportionate to the provocation. We think a jury could reasonably have found that Press encouraged his son and his two employees to pursue the Baldwins into the store where a number of customers were peacefully shopping, determined to even his score with Junior in complete disregard of their rights. We do not agree with the trial court's view, expressed during the trial, that Press' intent must be determined by his actions up to the time the plaintiff was struck. We consider it material and relevant that he kicked Junior a number of times, possibly in the head, after Junior had been overpowered and thrown to the floor. II Wigmore, Evidence, § 396, p. 353 (3rd ed. 1940). The defendants' actions strongly suggest vindictive measures of reprisal, rather than a natural response to provocation; we think a jury could have found

that Press had actual malice in pursuing the Baldwins into the store, and that an assessment of punitive damages against him was fully warranted by the evidence. It therefore follows that Press' after-trial motion for judgment should not have been sustained.

In accordance wtih the views expressed, it is ordered that the judgment be reversed and remanded with directions to reinstate the verdict of the jury and enter a judgment thereon accordingly.

STONE and TITUS, JJ., concur.

6. Philadelphia, Wilmington & Baltimore R. R. Co. v. Larkin, 47 Md. 155, 28 Am. Rep. 442, 445; Powell v. Meiers, supra, 54 N.D. 336, 209 N.W. at 550 [4]; Nichols v. Brabazon, 94 Wis. 549, 69 N.W. 342, 343 [3]; 6 Am.Jur.2d Assault and Battery, § 188, p. 155.