J.K. FORINASH and J.M. Forinash, his wife, James W. Forinash and Waneda Forinash, his wife, Joseph L. Forinash and Leigh Forinash, his wife, Ivan Boggs and Mary Boggs, his wife, Kathleen Fiquet, Bessie Kelley Herrington, Lilly Hobbs, Glen F. Kirkpatrick and Fern P. Kirkpatrick, his wife, Sylvia White and Helen Wilson, Plaintiffs-Respondents,

v.

E.L. DAUGHERTY, individually and as an officer and director of the Bank of Raymondville, a Missouri banking corporation, Joe E. Richardson, individually and as a director of the Bank of Raymondville, Maurice W. Covert, individually and as an officer and director of the Bank of Raymondville, E.T. Craig, individually and as a director of the Bank of Raymondville, and F.T. Bates, individually and as a director of the Bank of Raymondville, Defendants-Appellants.

No. 13440.

Missouri Court of Appeals,
Southern District,
Division Two.

July 30, 1985.

Motion for Transfer Denied
Sept. 10, 1985.

Application to Transfer Denied
Sept. 10, 1985.

Harold J. Fisher, John E. Price, Woolsey, Fisher, Whiteaker, McDonald & Ansley, Springfield, for defendants-appellants.

Kenneth M. Romines, Curtis & Crossen, Clayton, for plaintiffs-respondents.

HOGAN, Judge.

Plaintiffs brought this action in two counts, averring, among other things, that defendants Daugherty, Richardson, Covert, Craig and Bates, acting as officers and directors of the Bank of Raymondville, received an offer from one William L. McKnight to purchase control of the bank; that the defendants, as directors and officers of the bank, thereafter took advantage

of this offer, using their favored positions as directors and officers to advance the negotiations with McKnight and to accomplish the sale of stock (and control) to their personal profit at the expense of and to the exclusion of the plaintiffs. Plaintiffs further alleged that the defendants' actions in breach of their fiduciary duties were committed knowingly, intentionally and in willful and reckless disregard of plaintiffs' rights. There was a second count, upon which the trial court directed a verdict at the close of plaintiffs' case, but we need not be concerned with Count II on this appeal.

Venue of the cause was changed from Texas to Phelps County on plaintiffs' application and the case was tried to a jury. The jury found the issue tendered in favor of the plaintiffs and against the defendants and assessed plaintiffs' damages in the amount of $110,000. Punitive damages in the amount of $40,000 each were assessed against defendants Daugherty, Richardson and Covert. The defendants now appeal, contending, in substance, that the trial court erred in failing to grant their motion to dismiss plaintiffs' petition for failure to state a claim upon which relief could be granted; that the trial court erred in failing to grant their alternative motion for judgment notwithstanding the verdict; that the award of damages was not supported by substantial evidence; that there was no basis for the assessment of punitive damages, and there was instructional error.

■ The argument that the trial court erred in denying defendants' motion to dismiss may be disposed of shortly. Under our present practice, motions to dismiss serve the same functions as demurrers. *Baysinger v. Hanser*, 355 Mo. 1042, 1044, 199 S.W.2d 644, 645–46[1] (1947). The motion was very specific, but whether it be regarded as the equivalent of a "general" or "special" demurrer, the trial court's ruling was correct. The controlling rule in this case, again stated in outmoded language, is that when certain allegations in the petition do not state a cause of action, a demurrer should nonetheless be overruled if other allegations in the petition are sufficient to state a cause of action against the defendants. *New v. South Daviess County Drainage Dist. of Daviess County*, 240 Mo.App. 807, 817, 220 S.W.2d 79, 84[9] (1949).

■ In the view we take of this case, the issue of greatest importance and difficulty is whether the plaintiffs made a submissible case. It is basic that in determining whether a plaintiff has made a submissible case, this court must view the evidence in that light most favorable to the plaintiff, giving him the benefit of all reasonable inferences to be drawn from the evidence and disregarding the defendants' evidence except as it tends to support the verdict. *Baumle v. Smith*, 420 S.W.2d 341, 344[2] (Mo.1967); *Krug v. Sterling Drug, Inc.*, 416 S.W.2d 143, 146 (Mo.1967); *White v. Burkeybile*, 386 S.W.2d 418, 420 (Mo.1965).

So taken and considered the evidence shows that in 1978, the Bank of Raymondville was a small, well-run timber-country bank. We have not been favored with any call statements, but in the opinion of defendant E.L. Daugherty, who had been the equivalent of a chief executive officer for many years, the par or "book" value of a share of stock in the Bank of Raymondville was about $600 in January 1978.

There was no majority shareholder. Eight Hundred Seventy-Five shares of stock were outstanding. Plaintiff Kathleen Fiquet owned 110 shares; her mother had owned 87.5 shares which plaintiff Fiquet had inherited. Before she inherited that stock, she had owned 22.5 shares in her own name. Plaintiff Fiquet's grandfather had been a director and president of the bank from 1932 to the time of his death. Her mother had inherited part of her stock when plaintiff Fiquet's grandfather died and had thereafter purchased other shares. Plaintiff Jacob K. Forinash first acquired stock in the bank in 1969. He had inherited 5 shares on the death of his father, bought 5 shares from his sister, received 3 shares from a brother as a gift and bought half a share from a brother. Defendant Covert had served on the board

of directors from time to time for more than 40 years; he was president of the bank in 1978 and owned 145.5 shares of stock. Based on the pleadings and the testimony, there were 21 shareholders in 1978. If the stockholders were grouped by family, there were only 15 shareholders.

It also appears that the bank was a one-man bank. Defendant E.L. Daugherty had been a banker since 1938 and had been with the Bank of Raymondville since 1940. He was for many years cashier and was finally elected executive vice-president. Defendant Richardson testified that "when you had some banking to do, you usually went through [Daugherty] or trusted his knowledge." Defendant Covert was president, but his office was at Houston, where he practiced law. Daugherty's declining health prompted the sale of the bank. This is not to say that the directors took no part in the management of the bank; § 362.275, RSMo 1978, requires the directors of a state-chartered bank to review most of the important transactions which have taken place at least once each month. However, it is clear that day-to-day operation of the Bank of Raymondville was in Mr. Daugherty's hands.

The board of directors of the Bank of Raymondville, in 1978, was a five-man board. In January 1978 the board consisted of Mr. Daugherty, Mr. Covert, Mr. Richardson, Mr. Bates and Mr. Craig. Mr. Covert, as we have noticed, was (and is) a practicing attorney; Mr. Richardson owned a lumber company at Houston; Mr. Craig did not say how he earned a living, but said that he lived at Summersville. Mr. Bates was retired.

In January 1978, defendant Daugherty no longer felt able to attend to the business of the bank properly. He got in touch with a long-time banking acquaintance, Noel Shull (or Shaw). Mr. Shull was then employed by a Kansas City bank. Mr. Shull got in touch with one William L. McKnight, who at trial time lived at Lamar, in Barton County. McKnight indicated an interest in the Bank of Raymondville. At Daugherty's invitation McKnight came to Raymondville and in February, met with the board of directors. McKnight made it quite clear that he was interested in buying control or nothing. The directors present indicated that the price per share would be $1,000. McKnight's offer was not communicated to any of the plaintiffs. Thereafter, Daugherty and McKnight met privately several times. Finally on October 11, 1978, immediately following a board meeting, the defendants, their wives and relatives sold McKnight 496.75 shares of the outstanding 875 shares of stock in the Bank of Raymondville. Our calculations indicate that the defendants, their spouses and their kindred realized a gross profit of $294,550 from the sale. A memorandum made at the time and included in the board's minute book reads as follows:

"All the directors being present, after lengthy discussion the Board of Directors decided to sell all *their* stock being the following to Wm. L. McKnight:

| Certificate No. | No. of Shares | Certificate No. | No. of Shares |
|---|---|---|---|
| 227 | 5 | 228 | 25 |
| 226 | 45 | 222 | 5 |
| 221 | 70 | 249 | 12½ |
| 260 | 6½ | 264 | 17½ |
| 219 | 115 | 246 | 18¾ |
| 252 | 4¾ | 258 | 7 |
| 213 | 30 | 245 | 5 |
| 254 | 35 | 255 | 5 |
| 265 | 17½ | 253 | 4 |
| 224 | 32½ | 223 | 5 |
| 247 | 6¼ | 266 | 17½ |
| 259 | 7 | | |

The Chairman of the Board, M.W. Covert, sold 145.5 shares at 2:45 PM. The remaining board members then appointed Wm. L. McKnight to fill his vacancy. Mr. F.T. Bates then tendered his resignation at 2:50 PM and the remaining members appointed James Sturdevant to fill his vacancy. Mr. E.T. Craig then tendered his resignation at 2:55 PM and Mr. Jerry Thiemans [sic] was appointed to fill his vacancy. Mr. Joe E. Richardson resigned at 3:00 PM and Wm. L. McKnight II was appointed to fill his vacancy. Mr. E.L. Daugherty then resigned at 3:05 PM

and was reappointed to fill his own vacancy.

All board members having qualified by the required ownership of five shares of stock each, Wm. L. McKnight was then elected President of the Bank of Raymondville and E.L. Daugherty was elected Chairman of the Board and Executive Vice President...." (Our emphasis.)

In this connection, it is apparent that a majority of the directors were replaced by McKnight and men brought into the organization by him. McKnight replaced Mr. Covert, the largest single shareholder, who had been President of the bank. Mr. Sturdevant, who succeeded Mr. Bates on the board, was identified by defendant Covert as "a man that McKnight brought in." Mr. William McKnight, Jr., was identified as McKnight's son. It is also significant that at Mr. Covert's instigation, McKnight executed an instrument of indemnity, a species of "hold harmless" agreement for each of the directors. The instrument is set out marginally.[1]

The record reflects that this action was commenced in February 1979, about 4 months after the bank was sold. Plaintiffs were permitted to introduce and read in evidence a letter sent to several of the plaintiffs under date of May 27, 1981. The salient parts of the letter, sent out over the signature of an officer or employee of the bank, are as follows:

"... In its examination of the Bank in April of 1981, the Missouri Division of Finance classified $309,702.00 in loans as 'loss' and $225,980.00 in loans as 'doubtful' which the Bank was required to charge off for a total of $422,692.00, thus reducing the Bank capital to $122,946.21....

Following the examination ... the Missouri Commissioner of Finance has advised the Bank officers that $480,000.00 of additional capital must be placed in the Bank immediately or it will be closed. To prevent the closing, Mr. William McKnight and the other shareholders of the Bank Holding Company, Missouri Country Bancshares, Inc., have sold their interest in the Bank Holding Company to Mr. H. Robert Loughrey of Liberty, Missouri. Mr. Loughrey has agreed to make $480,000.00 in capital available to the Bank on a short term basis. These funds were advanced in the form of a $480,000.00 capital note which will be due and payable on July 11, 1981."

The letter went on to advise shareholders that a special shareholder's meeting was to be held to authorize the issuance of additional shares necessary to raise capital so as to repay the capital note and raise the capital of the bank to the level required by the Commissioner. In substance, the bank proposed a 5–1 split, giving each shareholder a pre-emptive right to purchase shares sufficient to maintain his percentage ownership in the bank. This offer was coupled with a tender offer to buy all outstanding shares at $140 per share. Thus, a jury could have concluded, that the Bank of Raymondville had gone from a well-run country bank to reorganization in less than 3 years under McKnight's management. Such, in substance, are the essential facts

1. "Know all men by these presents:

That I, Wm. L. McKnight, as part of the consideration for the purchase of certain shares of stock in the Bank of Raymondville from Maurice W. Covert, the receipt and legal sufficiency of such consideration being hereby acknowledged, do hereby agree to protect the said Maurice W. Covert, his heirs, executors, and administrators, and all, or any other person, firm, or corporation on his behalf, liable, or claimed to be liable, against any and all claim or claims, or action or actions, for damages, compensation, penalties, or otherwise, brought by any person, firm, corporation, or other entity, on account of any claim or damages arising out of, or related to the ownership by the said Maurice W. Covert of said stock in the Bank of Raymondville, [other than wilful and deliberate malfeasance] or any action taken, or any failure to take any action, as a shareholder, director, or officer of said corporation, and to hold harmless, reimburse, and make-good to the said Maurice W. Covert any loss, damages, costs, attorney-fees, or other expenses that he may suffer by reason of any such claim or action, whether justifiable, or unjustifiably made.

Dated this the 11th day of October, 1978.

s/ Wm. L. McKnight "

(Material in brackets inserted by interlineation.)

presented to the jury. Additional facts will be noted in the course of the opinion.

As a preface to and perhaps to lend a measure of clarity to the opinion, we observe that with minimal assistance from counsel, we have satisfied ourselves that no statute or regulation, state or federal, controls the law in this case. The Bank of Raymondville was and is a state-chartered banking corporation, but the merits of the appeal are not governed by rules of law peculiarly applicable to banks. The merits of this case are controlled by the law of corporations, particularly those described as "close" or "closely-held" corporations. We do not undertake to adopt any particular formulation of the fiduciary duties of corporate officers, nor shall we attempt to reconcile the conflicting precedents. The subject has been extensively discussed elsewhere.[2] Further, so the opinion will not be misunderstood, we address only the situation and particular appeal before us.

■ As noted, the primary question is whether the plaintiffs made a submissible case. The rule noted—that the evidence is taken and considered in the light most favorable to the plaintiffs—is tempered by the rule that the question of submissibility upon motion for directed verdict made at the close of all the evidence is different from the question of sufficiency presented upon motion for judgment n.o.v. because, by electing to submit his case on a particular pleaded theory, a plaintiff abandons all other pleaded grounds of recovery. *Guthrie v. City of St. Charles*, 347 Mo. 1175, 1182, 152 S.W.2d 91, 93 (banc 1941); *Carter v. Matthey Laundry & Dry Cleaning Company*, 350 S.W.2d 786, 795[12] (Mo. 1961); *Page v. Hamilton*, 329 S.W.2d 758, 762[5] (Mo.1959); *Bandag of Springfield, Inc., v. Bandag, Inc.*, 662 S.W.2d 546, 548[2] (Mo.App.1983); *George v. Howard Const. Co.*, 604 S.W.2d 685, 688–90[1][2] (Mo.App.1980). We must therefore determine whether the conduct submitted by the

plaintiffs' verdict-director was actionable. Plaintiffs' case was submitted to the jury by Instruction No. 6, which read as follows:

"Your verdict must be for plaintiffs if you believe:

First, plaintiffs were shareholders in the Bank of Raymondville, and

Second, defendants, were officers and the Board of Directors of the Bank, and

Third, defendants as officers and directors of the Bank received an offer to purchase controlling interest in the Bank, and

Fourth, defendants failed to disclose the offer to purchase controlling interest to plaintiffs, and

Fifth, defendants took advantage of their position as officers and directors and sold controlling interest in the Bank, and

Sixth, as a direct result of defendants failure to communicate the offer to purchase controlling interest, and defendants selling controlling interest plaintiffs were damaged."

The pleadings, evidence and the briefs make it quite clear that plaintiffs undertook to submit a breach of fiduciary duty by the defendants as directors and officers of the bank. The defendants' complaints addressed to the *form* of Instruction No. 6 are unsubstantial although they have been noted and considered. Defendants' substantive arguments may be resolved by considering: 1) what Instruction No. 6 submits to the jury as a basis for liability; 2) whether the evidence supports the submission, and 3) if the verdict-director is supported by substantial evidence, whether it submits actionable conduct by the defendants.

■ Paragraphs First and Second of Instruction No. 6 submit only facts which were not in dispute. Paragraph Third submits that McKnight's offer to purchase

**2.** See D. Ruder, Duty of Loyalty—A Law Professor's Status Report, 40 Bus.Law. 1383 (1985) [hereinafter *Ruder* ]; H. Henn and J. Alexander, Laws of Corporations §§ 235–240, pp. 625–656 (3d ed. 1983) [hereinafter *Henn & Alexander* ]; 2

F.H. O'Neal & R. Thompson, O'Neal's Oppression of Minority Shareholders § 7.17, p. 120–123 (2d ed. 1985) [hereinafter *O'Neal & Thompson* ]; Annots., 13 A.L.R.3d 361 (1967); 38 A.L. R.3d 738 (1971).

control was made to the defendants as officers *and directors* of the bank. Paragraph Fourth submits that the defendants failed to disclose the offer to purchase control to the plaintiffs. The evidence established, as we shall see, that the defendants did disclose the offer to purchase control to spouses and to relatives so they might take advantage of McKnight's offer. Perhaps the factual hypothesis of Paragraph Fourth could have been more specific, but we do not regard it as confusing and misleading or as a misstatement of the facts. At worst, the hypothesis is ambiguous and the controlling principle of instructional law is that an otherwise proper instruction is not necessarily erroneous because it is technically susceptible of differing constructions. *Deskin v. Brewer*, 590 S.W.2d 392, 400–401 (Mo.App.1979). Paragraph Fifth postulates that the defendants "took advantage of" their position to sell a controlling interest. Here the phrase "took advantage of" is used idiomatically; we consider that a jury composed of reasonable men and women would understand the phrase to be equivalent to the more specific phrases "to profit by" or to "exploit." Such is the everyday meaning of the idiom. Webster's Ninth New Collegiate Dictionary, p. 1202 (1983). Paragraph Sixth hypothesizes the plaintiffs' damages as a result of defendants' breach of fiduciary duty.

■ The plaintiffs were shareholders in the Bank of Raymondville. That defendants were officers and directors of the bank was not in issue and the hypotheses of fact served only as a predicate for liability. The facts hypothesized in Paragraph Third were that defendants, *as* officers and directors, received an offer to purchase a controlling interest in the bank. In our view, as much could readily be inferred from the evidence. In the course of his direct examination, McKnight was asked: "Q. Was there a time in February of 1978 when you met with Mr. Covert, Mr. Richardson, and Mr. Bates and Mr. Craig and Mr. Daugherty concerning the Bank of Raymondville? A. Yes, Sir. Q. Where did you meet? A. In the board room at the bank.... Q. At that time, was the sale of

the Bank of Raymondville discussed? A. Yes, Sir. Q. With whom did you discuss it? A. With the board. Q. With the five members of the board that we have just mentioned? A. Yes, Sir. Q. Who initiated any discussion in regard to price for the shares of stock? A. Mr. Daugherty. Q. What did he indicate to you that the price for the shares of stock would be? A. It would be a Thousand Dollars a share."

The nature and extent of Mr. McKnight's interest also came out in his direct examination, thus: "Q. Who was it that indicated to you, Sir, that they did not have enough shares for control—let me ask you this: you did want control of the Bank of Raymondville, didn't you? A. Yes, Sir. Q. And you had made that clear to Mr. Daugherty and to these other four gentlemen, had you not? A. *I wanted control or none of it.* Q. You didn't care who it was that sold you a share of stock as long as you got control? A. That's right. I didn't know any of the people involved." (Our emphasis.)

Despite the disclaimers of some of the defendants, it is a reasonable inference from this evidence that McKnight's offer was communicated to them as directors and officers of the bank. The defendants were the directors, assembled in the board room. The defendants were shareholders, but it is logically untenable to say that the offer to purchase control was communicated to them only as shareholders, given the fact that they did not own control. The factual hypothesis of Paragraph Third of Instruction No. 6 was supported by substantial evidence.

Paragraph Fourth, as we have noted, is to some degree ambiguous. In part, defendants' breach of their fiduciary duty, if any were to be found, lay in their outright nepotism in sharing McKnight's offer to purchase control at $1,000 per share. Nevertheless, the hypothesis of Paragraph Fourth is supported by substantial evidence. Each of the defendants was asked if he had informed any of the plaintiffs about McKnight's offer. Defendant Rich-

ardson did not communicate with any of the plaintiffs. Plaintiff Wilson asked him about a rumor she heard—that the bank was being sold—but Richardson did not tell her about McKnight's offer. After the meeting between McKnight and the directors in February, Daugherty contacted none of the plaintiffs. Covert did not disclose the offer to any of the plaintiffs; neither did Craig and Bates.

All of the plaintiffs learned of the transfer of control at second hand. Plaintiffs Hobbs, Jacob and James Forinash discovered the transaction through a newspaper account, as did plaintiff Fiquet. Neither plaintiff Wilson nor plaintiff Boggs were given any information about the transfer of control. A jury could have inferred, indeed, that the transaction was kept secret. On cross-examination, defendant Daugherty was asked: "Q. There has been some testimony, Mr. Daugherty, that maybe you or some of the other shareholders, the defendants here who sold this stock ... were trying to keep this confidential, and not spreading the word around.... [I]s that normally true that [such a transaction] likes to be more on the nature of a confidential transaction so that it could be covered smoothly and carried on and successfully acquired? A. That's right, but there is no way you can keep it quiet a hundred percent." There was evidentiary support for the inclusion of Paragraph Fourth in Instruction No. 6.

Paragraph Fifth submitted that defendants took advantage of their position as officers and directors and sold controlling interest in the bank. As stated, the phrase "take advantage of" was undoubtedly used to mean "profit by" or "exploit," and there was evidentiary support for this hypothesis. From what we have already said, it is clear a jury could have found the offer was communicated to defendants as officers and directors. Further in this respect, it is important to note what and how each of the defendants sold. Defendant Richardson sold 5 shares held in his own name, and 106.5 shares "possibly" held by him and his wife, presumptively as tenants by the entirety. Defendant Daugherty sold at least

15 shares which he owned, as well as his insurance agency, for which he received $20,000. After the transfer, Daugherty was given a job at $12,000 per year, plus an expense account. Daugherty did inform his wife of McKnight's offer; together Daugherty and his wife sold McKnight 75 shares of which at least 45 shares were owned in her own name. Defendant Craig sold 5 shares held in his name and 67.25 shares held in his name and his wife's name. Craig "mentioned" the offer to his son Kent and to his brother Dwayne. The Craig family sold 22.5 shares of stock to McKnight. Defendant Covert sold 145.5 shares, all held by him in his own name. Defendant Bates sold 35 shares; he made McKnight's offer known to his step-mother, who sold her 35 shares of stock.

After the shares were sold, as we have recounted, the directors resigned seriatim, beginning with Mr. Covert. As the directors resigned, they were replaced by others in such manner as to provide McKnight three of five directorships. There was evidence to support the facts hypothesized in Paragraph Fifth of Instruction No. 6. Paragraph Sixth submitted the plaintiffs' damages and the causality thereof, which we shall discuss presently.

Given that there are some factual uncertainties in the record, and granting that a jury might have found the facts and inferences to be other than as we have stated, the further question is whether Instruction No. 6 hypothesized actionable conduct upon the part of the defendants. Upon prolonged consideration, we conclude it did.

■ As a matter of general law, it may be said that the officers and directors of a corporation owe fiduciary duties to their corporation and to the other shareholders. These fiduciary duties possibly extend to controlling shareholders. *Henn & Alexander* § 235, pp. 625–628. Professor Henn and Mr. Alexander have it that cases involving fiduciary duties can traditionally be classified into those which involve a) competing with the corporation, b) usurpation of corporate opportunity, c) having some interest which conflicts with the corpora-

tion, d) insider trading, e) oppression of minority shareholders, and f) purchase or sale of control. They add, however, that "[such] situations . . . do not exhaust the possible corporate applications of fiduciary concepts." *Henn & Alexander*, § 235, p. 627.

Dean Ruder, in his recent discussion of the fiduciary duties of corporate managers—which he describes as a "duty of loyalty"—extends the fiduciary duty of corporate officers and directors to eight types of transaction. We need not discuss his enumeration in detail, but it is worth while to note that the sale of control at a premium and insider trading are classified as transactions in which corporate officers and directors owe a duty of loyalty—a fiduciary duty—to the shareholders. *Ruder*, 40 Bus. Law. at 1386–1401. Dean Ruder also emphasizes, as would we, that the "duty of loyalty" imposed by law on corporate officers and directors in the respects he enumerates is distinct from the responsibility to take business risks. That responsibility is governed by the "business judgment" rule.[3] Dean Ruder's general thesis is that the "duty of loyalty" owed by corporate managers needs restatement and clarification and he calls attention to the fact that the American Law Institute is presently engaged in such a project. We cordially agree with his premise, but it cannot deter us in this case.

Dean O'Neal's statement of the fiduciary obligations of corporate officers and directors is less specific than the others we have quoted, but he and Professor Thompson do point out that courts have held those in control of a closely-held corporation, especially a family corporation, to a very strict standard of fiduciary obligation, and that in decisions relating to such corporations, courts frequently analogize the duties of directors and shareholders to those of partners in a partnership. 2 O'Neal & Thompson § 7.17, p. 122.

In this state, our courts have not undertaken to classify the fiduciary duties of

corporate officers and directors, but in many different contexts and in varying factual situations it has been recognized that a director or officer of a corporation occupies a fiduciary relation to the corporation and its shareholders, and that he may not deal with the property of the corporation for his own benefit or profit at the expense of the shareholders. *Gieselmann v. Stegeman*, 443 S.W.2d 127, 136 (Mo.1969); *Ramacciotti v. Joe Simpkins, Inc.*, 427 S.W.2d 425, 431 (Mo.1968); *Bromschwig v. Carthage Marble & White Lime Co.*, 334 Mo. 319, 324, 66 S.W.2d 889, 891–92[1–2] (1933). This rule is particularly directed to secret and unconscionable profits. *Ramacciotti v. Joe Simpkins, Inc.*, 427 S.W.2d at 432. In the case before us, both parties, particularly the defendants, have relied on *Yax v. Dit-Mco, Incorporated*, 366 S.W.2d 363 (Mo.1963). We have read and reread that case, but it is not, in our view, controlling here. The text of the opinion shows that it was decided on the basis of the facts presented. Much more to the point is *Johnson v. Duensing*, 351 S.W.2d 27 (Mo. banc 1961). *Johnson* involved a manipulated sale of control; Duensing and others, as directors, sold treasury stock to one Proctor and others at a discount in order to obtain control of the corporation. The trial court set the transaction aside. Our Supreme Court affirmed, with some modification. The court held, inter alia:

> ". . . The board being in the position of trustee for the stockholders was in duty bound to act in the best interest of the corporation and the stockholders. . . . 'The officers and directors of a corporation occupy a fiduciary relation to the corporation and to the stockholders; their position is one of trust and they are bound to act with fidelity and subordinate their personal interest to the interest of the corporation should there be a conflict.'" (Citations omitted.)

Id. 351 S.W.2d at 32[5].

As noted, it has been considered that the officers, directors and controlling share-

---

**3.** *Ruder*, 40 Bus.Law. at 1385–1386 and nn. 13, 14. See also J. Deal, Liability of Bank Directors, 39 Bus.Law. 1033 (1984).

holders of a "close" corporation owe a higher degree of fiduciary duty to minority shareholders than do their counterparts in public corporations. Our courts have undertaken various definitions of a "close" corporation. In *Phelps v. Watson-Stillman Company*, 365 Mo. 1124, 1127, 293 S.W.2d 429, 431 (1956), our Supreme Court, describing the Watson-Stillman Company, stated: "Prior to June 1953 all of the outstanding shares were owned by fifty-six people, many of them descendants of the original founders of the company. The stock was not listed upon any stock exchange, had no over-the-counter market, and so, in the semantics of the market place, was a 'close corporation.'" In *Flarsheim v. Twenty Five Thirty Two Broadway Corp.*, 432 S.W.2d 245 (Mo.1968), the court defined a "close" corporation to be one in which the stock is owned by comparatively few persons who are active in the management of the company, and the shares are not listed on any exchange or otherwise traded by the public. In *Hopkins v. Hopkins*, 597 S.W.2d 702, 708 (Mo. App.1980), our colleagues at Kansas City utilized that definition of a "close" corporation adopted by the Supreme Judicial Court of Massachusetts in *Donahue v. Rodd Electrotype Co. of New England, Inc.*, 367 Mass. 578, 328 N.E.2d 505, 511 (1975). The Massachusetts Court deemed a close corporation to be typified by (1) a small number of stockholders; (2) no ready market for the corporate stock, and (3) substantial majority stockholder participation in the management, direction and operations of the corporation. Id., 328 N.E.2d at 511.

However, the court there noted that other jurisdictions, including Illinois, after which our corporation law was patterned, see *Flarsheim, supra*, 432 S.W.2d at 252, define a "close" corporation as one in which the stock is held in a few hands, or in a few families, and wherein it is not at all, or only rarely, dealt in by buying or selling. *Galler v. Galler*, 32 Ill.2d 16, 27, 203 N.E.2d 577, 583 (1964). Accord, *Masinter v. Webco Co.*, 262 S.E.2d 433, 435, n. 1 (W.Va.1980); *Brooks v. Willcuts*, 78 F.2d 270, 273 (8th Cir.1935). Current texts focus on the small number of shareholders, the activity of shareholders in the conduct of the business and a tendency to favor the principle of delectus personae with respect to additional associates. Henn & Alexander, *supra*, § 257, p. 694.

The point of such classification, as far as some jurisdictions are concerned, is to draw a parallel between a close corporation and an incorporated partnership and to impose upon the *shareholders* substantially the same fiduciary duty in the operation of the enterprise as that which partners owe to one another. See *Donahue v. Rodd Electrotype Co. of New England, Inc., supra*, 328 N.E.2d at 515[5]. We do not consider it necessary to explore the soundness of such conclusions in this case, but certainly the Bank of Raymondville had most of the characteristics of a close corporation. Before the sale of control in 1978 there were relatively few shareholders—21 in all—and there was little or no trading in the shares of the bank. The principle of delectus personae in the choice of new associates was actively practiced. Daugherty testified that if shares of stock were to be sold, the board of directors liked to know about it; "No obligation, but we liked to." The analogy to the definition of a close corporation adopted heretofore by our courts does not hold to the third characteristic—substantial majority shareholder participation in the management, direction and operation of the corporation—because prior to the sale, there was no single majority shareholder. There was a remarkable degree of "closeness" in the pedestrian sense of that word; recapitalization of the bank had been required about 1975. As Daugherty put it, "One year there we gained almost Three Million Dollars and we had to put in some additional capital." Describing the operation of the bank, defendant Covert testified: "... We always made money, but sometimes the bank grew faster than we made money and sometimes we had to—we always had to plow back some of those earnings to keep up with our growth and sometimes we had to plow back more than our earnings. I know one time we had to

chip in Fifty Thousand Dollars on it. Q. So it wasn't earnings but it was money out of your pocket back into the bank? ... A. Well, mine and ... the other shareholders."

■ Our point is this: if the Bank of Raymondville was not a close corporation within the meaning of the scope of the definitions adopted by our courts, it had many of the characteristics of a close corporation, and in our view the fiduciary duty of the officers and directors was accordingly heightened.

It is difficult, in this case, to fit the defendants' breach of duty into a single traditional category. As the defendants argue, the sale was not a sale of control by majority shareholders. In order to provide McKnight with the control he wanted, defendants were obliged to breach the secrecy of the original negotiation. · Daugherty advised his wife of the offer. Defendant Craig "mentioned it" to his wife, brother and son. Defendant Bates communicated the offer to his stepmother. In addition, the minutes of the meeting of October 11, 1978, most strongly indicated the defendants' agreement included a prearranged replacement of the board of directors. However, the dilemma usually inherent in the sale of control by majority shareholders is not really an issue in this case. The defendants were not sued as shareholders; the case was submitted against them as officers and directors of the bank. This court is not obliged to and does not undertake to balance a shareholder's right to sell his shares against the fiduciary duties of corporate officers. In our view, the facts of this case justify a finding that defendants violated their fiduciary duty by an oppressive sale of control. As a broad and general principle, the fiduciary duty of directors to avoid oppression of minority shareholders has been put thus:

> "Since directors, with respect to their exercise of their management functions, owe fiduciary duties to the corporation to exercise unbiased judgment in the best interests of the corporation as a whole, any attempt by directors to favor one intracorporate group to the detriment of another breaches such duties to the corporation and, in a sense, violates the implied term in the share contract between the corporation and any oppressed shareholder to the effect that corporate affairs will be managed in the best interests of the corporation...."

Henn & Alexander, *supra*, § 240, p. 652.

Dean O'Neal and Professor Thompson express almost the same idea, somewhat differently:

> "Sale of a controlling block of stock in a corporation may result in the seller being liable to the corporation.... Similarly, the seller may be subjected to liability to minority shareholders for breaching fiduciary duties owed to them. *Liability is imposed on the theory that* controlling shareholders, *corporate officers and directors, as fiduciaries must account for profits they make personally by using their dominant, strategic position for their own preferment to the exclusion or detriment of the corporation or its minority shareholders. In short, they can be compelled to account where they received a gain which can reasonably be traced to an abuse of their controlling position."* (Our emphasis.)

1 *O'Neal & Thompson* § 4.04, p. 24.

From the facts we have recited at exhausting length, a jury could have concluded: (1) that McKnight's offer was communicated to the defendants *as a board of directors* and that McKnight wanted to secure control as quickly as possible; (2) that the defendants negotiated with McKnight in secret, attempting to obtain and obtaining control by insider trading and by bringing wives, brothers, nephews and stepmothers in on the deal; (3) that they agreed to deliver and did deliver control of the corporation, including control of the board of directors to McKnight, and (4) realized an unconscionable and secret profit for themselves and their relatives by reason of the sale. After the sale, the only effective voice plaintiffs could have in corporate affairs, absent McKnight's indul-

gence, was resort to the courts. Such market as there had been for the shares representing their investment was practically destroyed. Oppressive conduct has been recognized as actionable by our courts, *Fix v. Fix Material Co., Inc.*, 538 S.W.2d 351 (Mo.App.1976), and in that case our colleagues at St. Louis recognized that oppressive conduct might be redressed by an action for damages. *Fix*, 538 S.W.2d 357, n. 3(j). It was further suggested, in *Fix*, 538 S.W.2d at 358[12] that usual definitions of "oppressive" conduct "are suggested perimeters of [a] broad term rather than narrow definitions which would tend to rob the term of its useful flexibility." Here, the defendants' action was oppressive and was a breach of fiduciary duty. The evidence was sufficient to support recovery on the ground submitted by Instruction No. 6.

Another argument advanced by the defendants is that plaintiffs made no proof of the value of their stock after the sale of control, therefore there was no evidentiary basis for submission of damages under plaintiffs' Instruction No. 7. The claim of error is *not* that the verdict is not responsive to the evidence.

Instruction No. 7 was MAI 4.02, modified by addition of the first paragraph of MAI 16.02, and read as follows:

"If you find in favor of plaintiffs, then you must award plaintiffs such sum as you may find from the evidence to be the difference between the fair market value of the plaintiffs' stock in the Bank of Raymondville before it was damaged and its fair market value after it was damaged.

The phrase 'fair market value' as used in this instruction means the price which the property in question would bring when offered for sale by one willing but not obliged to sell it, and when bought by one willing or desirous to purchase it but who is not compelled to do so."

■ The point is without merit. Defendant Richardson testified he bought 17.5 shares of stock from Wilda Ray for $600 per share in June 1978, four months before the sale of control occurred. Such evidence is evidence of the fair market value of the shares, *Byrd v. Brown*, 641 S.W.2d 163, 176–77[14, 15] (Mo.App.1982), but was not conclusive because at the time the sale was made, Mrs. Ray was in the process of liquidating assets to which she had succeeded upon the death of her husband. In such circumstances one cannot say the fair market value was obtained to the exclusion of other evidence. *In re Gooding's Estate*, 269 Wis. 496, 69 N.W.2d 586, 590[1] (1955). Defendant Daugherty, who had been in charge of the bank for many years and had "... started out [at the bank] in 1938 with a broom for Twenty-Five Bucks a month," testified that one minority shareholder's block of stock could "probably" have been sold for $600 to $650. Such testimony, so qualified, may indicate an opinion or may indicate only that a witness is not speaking with absolute certainty. *Leathers v. Sikeston Coca-Cola Bottling Company*, 286 S.W.2d 393, 396–97 (Mo.App.1956), Annot. 4 A.L.R. 979 (1919). And, in modern practice an "expert" witness may have acquired his expertise by experience alone or by having acquired information through the usual means of education or both. J. Weinstein, Basic Problems of Evidence 198 (1976). After 40 years with the Bank of Raymondville, and as its managing officer, Mr. Daugherty was qualified to give an opinion of the fair market value of the stock. In ascertaining the fair market value of the stock of an unlisted closely-held corporation, the opinions of experts are peculiarly appropriate, *Central Trust Company v. United States*, 305 F.2d 393, 399[1], 158 Ct.Cl. 504 (1962); *Rader v. United States*, 172 F.Supp. 833, 835–36[3] (D.C.Ill.1959), and on the record presented, there was ample evidence of the value of a share of stock of the Bank of Raymondville at the time control was sold.

■ The defendants concede as much, but say there was no evidence of the value of a share after control was sold. We cannot agree. Plaintiff Ivan Boggs inquired about the value of his stock; the matter became the subject of correspon-

dence between the two. Under date of November 20, 1978, McKnight, as president of the Bank of Raymondville, addressed a letter to Boggs. In pertinent part, the letter read:

"Your letter relative to my purported offer on your bank stock awaited me when I arrived at the bank this morning. In order for us not to misunderstand each other I think if you will remember, I did not make you an offer for your bank stock, but rather stated that at this time I was not really interested in purchasing any more stock. My further comment was if I were to purchase any, it would not be at any price over $250.00 per share, but probably nearer $225.00 per share...."

This communication cannot be construed as anything other than an opinion, but we agree with the plaintiffs' view that it was an informed opinion and upon the principles just stated was evidence of the value of the stock after the sale of control. In addition, it was brought out that Mr. Boggs had a conversation with defendant Covert after the sale and Covert gave it as his opinion that after the sale, a share of stock was worth $225. There was, in our opinion, substantial evidence of the reasonable market value of the stock immediately before and after the sale of control, sufficient to support the giving of Instruction No. 7. As the literature shows [4] and our Supreme Court has held:

"The judicial determination of value must be an informed judgment, but 'fair value' is not susceptible of determination by any precise mathematical computation and no one formula or figure is binding or conclusive...."

*Flarsheim v. Twenty Five Thirty Two Broadway Corp, supra,* 432 S.W.2d at 255[13]; *Miranda v. Miranda,* 596 S.W.2d 61, 65[2] (Mo.App.1980). The point must be ruled against the defendants.

Defendants Daugherty, Richardson and Covert also contend there was no substantial evidence which would warrant the submission of an award of punitive damages against them. The defendants have simply assumed, in this connection, as they have with respect to the other points briefed, that the plaintiffs' petition must be construed as an attempt to invoke the theory that dominant shareholders may, in some circumstances, be accountable to the minority for a profit or bonus received on the sale of stock to outsiders. As they argue, dominant or majority shareholders have usually been held liable on this theory only where there has been a breach of the dominant or majority shareholders' broad fiduciary duties to their company and their fellow stockholders. See Annot., *supra,* 38 A.L.R.3d at 743. The court has considered the case on its peculiar facts, however, and has concluded that defendants violated their fiduciary duty to refrain from favoring one intracorporate group over another; such conduct, the books indicate, violates an implied term in the share contract itself. *Henn & Alexander, supra,* at p. 652.

■ As a general rule, our courts have adhered to the view that punitive damages are not generally awarded unless the breach of contract amounts to an independent and willful tort and there are proper allegations of malice, wantonness or oppression. See, e.g., *Greening v. Klamen,* 652 S.W.2d 730 (Mo.App.1983). The plaintiffs did aver that defendants breached their fiduciary duties knowingly, intentionally and in willful and reckless disregard of plaintiffs' rights. We have the view, although the court was applying the law of Kansas, that the principles here involved were correctly stated by our colleagues at Kansas City in *Garrett v. American Family Mutual Insurance Co.,* 520 S.W.2d 102, 120–21 (Mo.App.1974), Annot., 88 A.L.R.3d 1115 (1975). In part, the court there held that under certain circumstances, the law imposes upon the parties to a contract an affirmative duty of conduct the breach of which gives rise to an independent tort for

---

**4.** See Jennings, Issues in Valuing Closely Held Businesses, 37 J.Mo.Bar 243 (1981); *compare* the range of values presented to the court by

"experts" in *Central Trust Company,* 305 F.2d at 408.

which punitive damages may be recovered. Id. at 120 (citations omitted). The court went on to say:

"The rule properly stated, then, is not that plaintiff must plead and recover upon an independent tort, but that the manner in which the breach occurred constitutes a willful tort for which an action for exemplary damages will lie...."

Id. at 121. An elementary but reliable text carries the rule further:

"[Punitive damages] are also awarded where the breach also involves the malicious or wanton violation of a fiduciary duty even where the violation does not constitute an independent tort."

Calamari and Perillo, Contracts § 14-3, p. 521 (2d ed. 1977). We conclude that an award of punitive damages was permissible here and that there was evidence to support an award of such damages against defendants Daugherty, Richardson and Covert. It could be found or reasonably inferred from the evidence that defendant Daugherty contrived the sale and transfer of control, even though the other directors were aware of the nature of the transaction; defendant Richardson engaged in "insider" trading with Mrs. Wilda Ray in order to obtain shares to sell at a profit. In our view, it could be inferred that Mr. Covert was aware that he was violating a fiduciary duty to the minority shareholders; it was he who drafted the "hold harmless" or indemnity agreements executed by McKnight for all the directors. We shall not comment at length on these indemnity agreements beyond saying there is a remarkable parallel between the scope of the indemnity agreement and that liability usually covered by a Directors and Officers Liability Policy.

Several claims of instructional error have been made. One such assignment of error is that the two words "or defense" were retained in Instruction No. 4, which is derived from MAI 3.01, even though the defendants submitted no affirmative defense. It is true that Instruction No. 4 deviated from MAI to the extent

asserted. Defendants, citing us to *Affiliated Foods, Inc. v. Strautman,* 656 S.W.2d 753 (Mo.App.1983), wherein a similar claim of instructional error was asserted and reported, contend that we should adopt the view of the dissenting member of the court. We decline. Failure to follow MAI, including the Notes on Use, is error, with the prejudicial effect of the error subject to judicial assessment. Mo.R.Civ.P. 70.02(b). It is not enough to show erroneous deviation unless prejudice also appears. *Hudson v. Carr,* 668 S.W.2d 68, 71[3] (Mo. banc 1984). The defendants' complaints about the verdict-directing instruction are, in the final analysis, complaints that Paragraphs "Second" and "Third" are prejudicially erroneous because only defendants Covert and Daugherty were both officers and directors of the bank. Here again, we find no prejudicial error. The use of the phrase "officers and directors" may have rendered the instruction ambiguous, but we cannot find that Instruction No. 6 was prejudicially erroneous.

The substance of the other complaints of instructional error has been adequately considered elsewhere in the course of the opinion.

The judgment is in all respects affirmed.

MAUS, P.J., concurs.

PREWITT, J., dissents and files opinion.

PREWITT, Chief Judge, dissenting.

I respectfully dissent.

Stockholders often have their interests adversely affected by those in control, possibly to a greater extent in a "close" corporation, or perhaps stockholders of a close corporation are more aware of the activities affecting them. A cause of action should not exist against those in control unless they breached a duty to the other shareholders. On the basis submitted, I see no such duty.

The directors and officers are to manage and provide for the management of the corporation, and to protect the interests of the shareholders in the assets of the corpo-

ration. Liability is asserted against defendants for depreciating the value of the plaintiffs' shares by selling "controlling interest" without notice to plaintiffs of the offer to purchase. Notice of the offer is not within the duties the defendants were obligated to perform and was beyond what should have been required of them. See *Ritchie v. McGrath,* 1 Kan.App.2d 481, 571 P.2d 17 (1977), following *McDaniel v. Painter,* 418 F.2d 545 (10th Cir.1969). See also *Goode v. Powers,* 97 Ariz. 75, 397 P.2d 56 (1964); *Benson v. Braun,* 8 Misc.2d 67, 155 N.Y.S.2d 622 (1956); *Levy v. American Beverage Corp.,* 265 App.Div. 208, 38 N.Y. S.2d 517 (1942).

I would reverse the judgment.

### ON MOTION FOR REHEARING OR TO TRANSFER

PER CURIAM:

The defendants have filed a vigorous motion for rehearing or for transfer to the Supreme Court. In the main, the defendants have merely reargued matters already considered, but in one respect they are indubitably correct. In the principal opinion, the court did not specifically discuss defendants' claim of instructional error in submitting the question of punitive damages. This assignment was not discussed because this court believed that the error assigned was not prejudicial. After rehearing upon the specific point our opinion remains unchanged. However, in fairness to the able advocates who represent the defendants, an explanation is called for.

■ The trial court submitted the issue of punitive damages against defendants Daugherty, Richardson and Covert by combining the 1978 revision of MAI 10.01 and the 1981 revision of 10.03. The substance of defendants' objection is that the plaintiffs did not submit the liability of each such defendant by a separate instruction, as required by both the 1981 and 1983 revisions of MAI 10.03. Rule 70.02(c) provides that the giving of an instruction in violation of MAI "shall constitute error, its prejudicial effect to be judicially deter-

mined." Careful reconsideration of the record has led us to believe there was no prejudicial error.

Recently, our Supreme Court has indicated that although litigants are entitled to a submission which is legally correct, it must be recognized that retrials are burdensome, and has noted a trend away from reversal for error in instructions unless there is a substantial indication of prejudice. *Fowler v. Park Corp.,* 673 S.W.2d 749, 756–757 (Mo. banc 1984). Also in *Hudson v. Carr,* 668 S.W.2d 68, 71 (Mo. banc 1984), the court held inter alia, 668 S.W.2d at 71[3], "... It is not enough to show erroneous deviation unless prejudice also appears...."

■ Specifically, it is proper to look to the closing arguments to determine whether a deviation from MAI has had a prejudicial effect upon the jury. *Fowler v. Park Corp.,* 673 S.W.2d at 756[13]; *Welch v. Hyatt,* 578 S.W.2d 905, 914[7] (Mo. banc 1979). At the instructions conference, plaintiffs' counsel was instructed to identify the defendants against whom plaintiff sought punitive damages. This instruction was faithfully obeyed. The final arguments were preserved. Counsel made it clear that plaintiffs sought punitive damages only from defendants Daugherty, Richardson and Covert, as follows:

"I ask you ... to do what [you] think is correct ... and return to these people what these men have destroyed. There is one way, that is to fill the verdict form in where it says *actual* damages, place in the figure that you believe is correct. *In regard to Mr. Bates and Mr. Craig, I don't believe they did anything maliciously, wantonly or wilfully. I'm sorry, but I think the ... other ... men did....*" (Emphasis ours.)

The form of the verdict given the jury as "Verdict A" was also curative. The verdict form was the 1982 Revision of MAI 36.12; the verdict form itself made allowance for the assessment of punitive damages *only* against defendants Daugherty, Richardson and Covert.

We have carefully considered the precedents cited to us by defendants' counsel,

including *Annbar Associates v. American Express Co.*, 565 S.W.2d 701 (Mo.App. 1978), and *Saunders v. Flippo*, 639 S.W.2d 411 (Mo.App.1982), but we do not find them controlling. Considering the whole record, it is manifest that the jury understood that defendants Daugherty, Richardson and Covert were entitled to have their conduct considered separately for the purpose of determining whether or not punitive damages should be assessed. That is the purpose served by separate submissions of liability for punitive damages. *Annbar Associates v. American Express Co.*, 565 S.W.2d at 710; *Fordyce v. Montgomery*, 424 S.W.2d 746 at 751[6–8] (Mo.App.1968). There was deviation from MAI; there was no prejudice to the defendants.

The principal opinion has been slightly modified to clarify our views; the defendants' claim of instructional error which was not addressed has been addressed. The court finds no reason to prolong its opinion. No further motion for rehearing is necessary or appropriate. If the defendants still feel themselves aggrieved, they know their remedy.