**Michael JONES, Plaintiff/Appellant,**

v.

**William SHERMAN and OA Technologies, Inc., Defendants/Respondents.**

No. 62408.

Missouri Court of Appeals,
Eastern District,
Division Three.

June 15, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 14, 1993.

Application to Transfer Denied
Aug. 17, 1993.

Frank Susman, Randall B. Kahn, Gregory Kent Allsberry, Clayton, for plaintiff/appellant.

Robert J. Will, James Vincent O'Brien, St. Louis, for defendants/respondents.

GARY M. GAERTNER, Presiding Judge.

Appellant, Michael Jones, appeals the grant of respondents' motion for judgment notwithstanding the verdict in the Circuit Court of St. Louis County. We affirm.

Appellant and respondent, William Sherman, first met in 1985 while respondent was working for Polygon, Inc., a computer software company specializing in D.E.C.–compatible products.[1] Respondent interviewed appellant to fill a position at Polygon. Although appellant was not hired, respondent invited appellant to work for him in a company respondent wanted to form. Appellant agreed.

On December 16, 1986, appellant and respondent organized and incorporated OA Technologies, Inc. (OA Tech) to develop software which would allow personal computers to interface with the D.E.C. VAX mainframe. Appellant's position in the company was largely administrative. He was responsible for finance, administration, marketing, public relations, pricing and negotiating agreements with other companies. Respondent was responsible for programming, coding and all technical matters. In the spring of 1987, shortly after incorporation, OA Tech hired John Scott to act as Sales Manager and Karl Krummenacher to provide technical sales support. OA Tech's capital stock was divided among the four as follows: Sherman (respondent) 57%, Jones (appellant) 28%, Scott 10% and Krummenacher 5%.

OA Tech soon began development of a software product called OATMail, which would allow personal computer users to communicate through a D.E.C. VAX main-frame. Because their software required a D.E.C. system to operate, the officers of OA Tech sought to align themselves with D.E.C. The first few years, however, were lean ones. Target salaries were not met and the company slid into debt.

OA Tech's marketing effort was three-pronged. First, Scott made cold calls to D.E.C. customers to solicit business for OA Tech. Second, Sherman travelled extensively to meet with potential customers and demonstrate the company's products.[2] Third, appellant negotiated agreements with independent distributors, to provide outlets for the company's software. By 1988, OA Tech had exclusive marketing agreements with Network Engineering, Inc. of Reading, England, and Applied Computing, Ltd. of Sydney and Perth, Australia.

Through OA Tech's Australian connections, the company learned that Hong Kong Shanghai Bank (HKSB), one of the world's ten largest banks, was soliciting bids for an office automation system in all of its branches worldwide. Documents reviewed by OA Tech revealed 12,500 potential users at HKSB. All major computer companies, including D.E.C., submitted bids on the multimillion dollar contract. Seizing this opportunity, OA Tech and Applied Computing began efforts to sell the OATMail program to D.E.C.'s Far Eastern Division and HKSB directly.

In pursuit of this opportunity, Sherman travelled to Hong Kong in the Spring of 1988, where he gave presentations about OATMail to representatives of both HKSB and D.E.C. In May 1988, D.E.C. salesmen from Hong Kong and New Hampshire came to St. Louis to meet with OA Tech. Appellant even picked up the D.E.C. official from Lambert Airport.

During the Summer of 1988, appellant became increasingly dissatisfied with the operation of the company. Due to a poor second quarter, OA Tech's debt and accounts payable exceeded its cash position

---

**1.** Digital Equipment Corporation, a major figure in this lawsuit, is the world's second-largest manufacturer of computer hardware.

**2.** Appellant was often critical of Sherman's activities, calling them "missionary selling."

by June 30, 1988. A number of OA Tech's bills were also past due. Appellant authored and circulated a document entitled "How Did We Get Here," in which he summarized and critiqued OA Tech's problems and operations. He especially criticized Sherman's "missionary selling" efforts in general and the HKSB deal in particular. Due to his dissatisfaction, the company's shaky financial position, and his conflicts with Sherman, appellant decided to leave OA Tech in August 1988. All contact with his former colleagues ceased when he left.

Appellant knew of OA Tech's financial troubles and, as the company's second-largest stockholder, he was concerned about his investment. He therefore made a written buy-out proposal whereby OA Tech or Sherman personally would pay appellant $58,300.00 for back salary (the difference between the amount he was actually paid and his target salary), and $28,500.00 for his stock. Further dissatisfied when he received no response to his proposal, appellant wrote a letter to Sherman dated September 23, 1988, demanding payment by October 10, 1988, or the matter would be turned over to his attorney. Sherman responded, rejecting any claim for back salary and stating that, when the company was able to make a cash offer for appellant's stock, it would do so. Until then, Sherman wrote, there was nothing he could do. A series of terse, adversarial letters followed from appellant, threatening litigation and dictating terms and deadlines.

Meanwhile, D.E.C.'s overtures to the company were looking better. On November 22, 1988, Sherman met with D.E.C. representatives at its headquarters in Nashua, New Hampshire. Although extensive discussions with high-level D.E.C. executives occurred, Sherman left the meeting feeling pessimistic because nothing specific was worked out. In an attempt to settle their differences, Scott met with appellant in early December, 1988. Scott brought a cash position statement for OA Tech showing the company's financial position as of November 30, 1988. It showed the company owed $36,000.00 more than it had. Scott told appellant that Sherman had made a second trip to Hong Kong for a re-bidding of the HKSB contract. When appellant heard this, he rolled his eyes and said, "You guys will never learn." Appellant made no requests for any additional information.

At that meeting, appellant and Scott decided to resolve the situation. They agreed to settle all claims for one lump sum of $50,000.00. Appellant would resign all positions with OA Tech, and the company would buy his stock. Of this amount, $5,000.00 was payable immediately, leaving the remaining $45,000.00 payable over time. This agreement was then turned over to attorneys, who put the document in final form. The agreement provided, *inter alia*, for waiver and release of all claims by appellant against respondents, whether known or unknown and whether existing now or in the future. All payments under this agreement were timely made by respondents.

On December 14, 1988, after receiving a phone call from D.E.C., OA Tech sent two copies of the OATMail program to D.E.C., along with supporting documentation. On January 3, 1989, Sherman travelled to New Hampshire to meet with D.E.C. again. Surprisingly, D.E.C. began discussing a non-exclusive, worldwide support agreement for the HKSB deal. Sherman left this meeting feeling pessimistic as well, however, because he learned that D.E.C. was conducting simultaneous negotiations with one of his competitors, Desk Executive, and D.E.C. supposedly favored the competitor. Two weeks later, Sherman travelled to Reading, England, to demonstrate OATMail to a group of D.E.C. engineers.

After his trip to England, Sherman spent little more time on the HKSB deal. In fact, all his effort was for naught. HKSB never accepted D.E.C.'s proposal, so they could never use OATMail. This was a tremendous blow to OA Tech and the company nearly failed. Sherman took out a $50,000.00 mortgage on his home just to keep the company afloat.

In April, 1989, D.E.C. suddenly eliminated their own in-house electronic mail pro-

gram and asked OA Tech to take over engineering that product. An exclusive distribution agreement was negotiated, and the parties signed it on June 27, 1989.

As a result of this agreement, OA Tech became a software engineering organization and no longer engaged in marketing and distribution. Salaries of all OA Tech principals nearly doubled, and the company's future was assured.

Sherman and Scott met with appellant in June, 1989, to pay off OA Tech's obligations under the settlement agreement appellant had negotiated. Shortly thereafter, appellant filed suit based on the possibility that Sherman had been negotiating the repurchase of appellant's stock while he was also negotiating his apparent *coup* with D.E.C.

Two years later, in early 1991, the relationship between D.E.C. and OA Tech ended when D.E.C. took all work away from OA Tech. Several large payments were made to OA Tech and distributed to the shareholders on a *pro-rata* basis. Sherman received $1,068,000.00, while Scott and Krummenacher each received $228,857.14.

At trial, appellant stated he would never have sold his stock if he had known of the ongoing negotiations between OA Tech and D.E.C. He further claimed Sherman fraudulently concealed favorable information about the corporation from him. On April 16, 1992, the jury found in favor of appellant, awarding him $188,600.00, plus costs. On May 1, 1992, the court granted respondent's motion for J.N.O.V. on the grounds that there was insufficient substantial probative evidence to support the jury's verdict. This appeal ensued.

Appellant's only allegation of error is that the trial court improperly granted respondent's motion for J.N.O.V. because appellant adduced sufficient evidence on each element of the verdict directing instruction.

■■■ Our review of the grant of a motion for J.N.O.V. is as a matter of law. *Rhodes v. Marsh*, 807 S.W.2d 222, 222 (Mo. App., E.D.1991). Granting a motion for J.N.O.V. is akin to directing a verdict at the close of all the evidence. *Midwest Materi-*

*als v. Village Development*, 806 S.W.2d 477, 489 (Mo.App., S.D.1991). When determining whether a plaintiff has made a submissible case, an appellate court views all evidence and inferences in the light most favorable to the plaintiff below. *Id.*

Our analysis begins with the settlement agreement which was signed by appellant and William Sherman for OA Tech. The agreement provides in pertinent part:

8. Except as herein provided to the contrary, OA and JONES each waive, release and relinquish the other from any and all claims, rights, duties, obligations and causes of action, existing now or in the future, whether known or unknown, arising from, related to or connected with the prior relationship of JONES as an officer, director, shareholder or employee of OA.

The instant action certainly qualifies as an unknown future cause of action under the agreement. Therefore, appellant has the burden of proving the above release does not bar this action. *Landmark N. Cty. Bank v. Nat. Cable Tr.*, 738 S.W.2d 886, 890 (Mo.App., E.D.1987).

■■■ Although not specifically stated in appellant's second amended petition, appellant generally alleges that the above release is void due to fraudulent misrepresentation on the part of respondents. Because appellant signed the settlement agreement, he must prove its invalidity by reason of fraud. *Abbey v. Heins*, 546 S.W.2d 553, 554 (Mo.App., St.L.D.1977). The elements of fraud are: (1) A representation; (2) Its falsity; (3) Its materiality; (4) The speaker's knowledge of its falsity or ignorance of its truth; (5) His intent that it should be acted on by the person and in the manner reasonably contemplated; (6) The hearer's ignorance of its falsity; (7) His reliance on its truth; (8) His right to rely thereon. *Id.* Furthermore, to support cancellation of an instrument such as the instant release, the evidence must go beyond a mere preponderance of testimony and remove all reasonable doubt. *Hackett v. St. Joseph Light & Power Co.*, 761 S.W.2d 206, 209 (Mo.App., W.D.1988);

*Stein v. Stein Egg & Poultry Co.,* 606 S.W.2d 203, 205 (Mo.App., E.D.1980).

■ Beginning with the first two elements of fraud, we see no evidence of a false representation. In fact, the evidence seems to show respondents were quite candid with appellant, despite his rather adversarial mindset. At the meeting between appellant and John Scott in early December, 1988, respondents provided appellant with a current cash position statement and the very honest admission that "nothing was imminent." Scott's attempt to inform appellant of possible minor progress on the HKSB deal met only with scoffing. Appellant made no further requests for information and admitted at trial that the representations Scott made at the meeting were truthful and accurate.

Regarding the second element by itself, none of respondents' representations were false. Respondents painted a bleak picture of the company when it appeared it was, in fact, going under. They highlighted the unlikelihood that the HKSB deal would ever develop, and it never did. Scott told appellant that "nothing was imminent," and as far as anyone at OA Tech knew, nothing was.

Lastly, element (8) concerns appellant's right to rely on respondents' representations. As of September 23, 1988, (the date of appellant's first demand letter) and perhaps as early as the beginning of August, 1988 (when appellant decided to leave the company), the parties to this suit had an adversarial relationship. Appellant voluntarily left OA Tech after expressing extreme dissatisfaction, he demanded money for his stock and other claims at a time when he knew payment would be next to impossible, and he threatened legal action against his former colleagues. Appellant also testified that, as of October 7, 1988, he knew he was on his own and had to watch out for his own interests. A reasonable reliance cannot possibly arise from such a situation.

Furthermore, all but two items on appellant's laundry list of allegedly concealed acts occurred *after* appellant signed the settlement agreement. First, Sherman travelled to Hong Kong to deal with a project appellant viewed with extreme skepticism, and second, Sherman had a meeting with the D.E.C. global marketing executives which, in Sherman's mind, went badly because D.E.C. appeared to be delaying. Every other act occurred after appellant signed his agreement and release.

■ Finally, the law is quite clear that respondents had no duty to disclose information to appellant. Appellant claims such a duty, based on a fiduciary relationship with respondents and the Southern District's opinion in *Forinash v. Daugherty,* 697 S.W.2d 294 (Mo.App., S.D.1985). Appellant's reliance is misplaced, as the *Forinash* court specifically limited their holding to the facts of the case before them. *Forinash,* 697 S.W.2d at 299. The fiduciary duties are owed *to the corporation,* not its individual shareholders, officers or directors. *Dawson v. Dawson,* 645 S.W.2d 120, 125 (Mo.App., W.D.1982).

A sizeable portion of appellant's brief and evidence at trial consists of internal D.E.C. memoranda which, for considerations of sheer volume, we feel compelled to address. As stated above, these are internal confidential memoranda, many of which are subject to a protective order. Obviously, respondents never saw any of these documents, and since appellant alleges respondents affirmatively hid things from him, respondents are required to know what they were allegedly hiding to support a verdict in appellant's favor. None of these memoranda constitute relevant evidence in this action.

Based on all of the foregoing factors, we affirm the circuit court's grant of judgment N.O.V. in favor of respondents. Respondents' motion to strike appellant's reply brief is denied as moot.

SMITH and STEPHAN, JJ., concur.